(Slip Opinion) OCTOBER TERM, 2021 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## YSLETA DEL SUR PUEBLO ET AL. *v.* TEXAS

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 20–493.  Argued February 22, 2022—Decided June 15, 2022

This case represents the latest conflict between Texas gaming officials
and the Ysleta del Sur Pueblo Indian Tribe.  In 1968, Congress recog-
nized the Ysleta del Sur Pueblo as an Indian tribe and assigned its
trust responsibilities for the Tribe to Texas.  82 Stat. 93.  In 1983,
Texas renounced its trust responsibilities as inconsistent with the
State's Constitution.  The State also expressed opposition to any new
federal trust legislation that did not permit the State to apply its own
gaming laws on tribal lands.  Congress restored the Tribe's federal
trust status in 1987 when it adopted the Ysleta del Sur and Alabama
and Coushatta Indian Tribes of Texas Restoration Act. 101 Stat. 666.
The Restoration Act also "prohibited" as a matter of federal law "[a]ll
gaming activities which are prohibited by the laws of the State of
Texas." *Id.*, at 668.  Shortly thereafter, Congress adopted its own com-
prehensive Indian gaming legislation: the Indian Gaming Regulatory
Act (IGRA).  IGRA established rules for separate classes of games.  As
relevant here, IGRA permitted Tribes to offer so-called class II
games—like bingo—in States that "permi[t] such gaming for any pur-
pose by any person, organization or entity." 25 U. S. C. §2710(b)(1)(A).
IGRA allowed Tribes to offer class III games—like blackjack and bac-
carat—but only pursuant to negotiated tribal/state compacts.
§2703(8).

   Pursuant to IGRA, the Tribe sought to negotiate a compact with
Texas to offer class III games.  Texas refused, arguing that the Resto-
ration Act displaced IGRA and required the Tribe to follow all of the
State's gaming laws on tribal lands.  In subsequent federal litigation,
the District Court held that Texas violated IGRA by failing to negoti-
ate in good faith.  The Fifth Circuit reversed, holding that the Resto-

ration Act's directions superseded IGRA's and guaranteed that the entirety of "Texas' gaming laws and regulations" would "operate as surrogate federal law on the Tribe's reservation." 36 F. 3d 1325, 1326, 1334 (*Ysleta I*). In 2016, the Tribe began to offer bingo, including "electronic bingo" machines, on the view that IGRA treats bingo as a class II game for which no state permission is required so long as the State permits the game to be played on some terms by some persons. The State then sought to shut down all of the Tribe's bingo operations. Bound by *Ysleta I,* the District Court sided with Texas and enjoined the Tribe's bingo operations, but the court stayed the injunction pending appeal. The Fifth Circuit reaffirmed *Ysleta I* and held that the Tribe's bingo operations were impermissible because they did not conform to Texas's bingo regulations.

*Held*: The Restoration Act bans as a matter of federal law on tribal lands only those gaming activities also banned in Texas. Pp. 8–20.

(a) Section 107 of the Restoration Act directly addresses gaming on the lands of the Ysleta del Sur Pueblo. It provides in subsection (a) that "gaming activities which are prohibited by [Texas law] are hereby prohibited on the reservation and on lands of the tribe." Subsection (b) insists that the statute does not grant Texas "civil or criminal regulatory jurisdiction" with respect to matters covered by §107. The State reads the Act as effectively subjecting the Tribe to the entire body of Texas gaming laws and regulations. The Tribe, however, understands the Act to bar it from offering only those gaming activities the State fully prohibits, and that if Texas merely regulates bingo, the Tribe may also offer that game subject only to federal-law, not state-law, limitations.

The language of §107—particularly its dichotomy between prohibition and regulation—presents Texas with a problem. Texas concedes that its laws do not "forbid," "prevent," "effectively stop," or "make impossible" bingo operations in the State. Webster's Third International Dictionary 1813 (defining "prohibit"). Instead, the State admits that it allows the game "according to rule[s]" that "fix the time," place, and manner in which it may be conducted. *Id.*, at 1913 (defining "regulate"). From this alone, Texas's bingo laws appear to fall on the regulatory rather than prohibitory side of the line. In response, Texas describes its laws as "prohibiting" bingo *unless* the State's regulations are followed and insists that it is merely seeking to do what subsection (a) allows.

Texas's understanding of the word "prohibit" would risk turning the Restoration Act's terms into an indeterminate mess. In Texas's view, laws regulating gaming activities *become* laws prohibiting gaming activities—an interpretation that violates the rule against "ascribing to one word a meaning so broad" that it assumes the same meaning as

another statutory term. *Gustafson* v. *Alloyd Co.,* 513 U. S. 561, 575. Indeterminacy aside, the State's interpretation would leave subsection (b)—denying the State regulatory jurisdiction—with no work to perform. As a result, Texas's interpretation also defies another canon of statutory construction—the rule that courts must normally seek to construe Congress's work "so that effect is given to all provisions." *Corley* v. *United States,* 556 U. S. 303, 314 (internal quotation marks omitted). Seeking to give subsection (b) real work to perform, Texas submits that the provision serves to deny its state courts and gaming commission "jurisdiction" to punish violations of subsection (a) by sending such disputes to federal court instead. But that interpretation only serves to render subsection (c), which grants federal courts "exclusive" jurisdiction over subsection (a) violations, a nullity. A full look at the statute's structure suggests a set of simple and coherent commands; Texas's competing interpretation renders individual statutory terms duplicative and leaves whole provisions without work to perform. Pp. 8–12.

(b) Important contextual clues resolve any remaining questions. Congress passed the Restoration Act six months after this Court handed down its decision in *California* v. *Cabazon Band of Mission Indians,* 480 U. S. 202. There, the Court interpreted Public Law 280—a statute Congress had adopted in 1953 to allow a handful of States to enforce some of their criminal laws on certain tribal lands—to mean that only "prohibitory" state gaming laws could be applied on the Indian lands in question, not state "regulatory" gaming laws. The *Cabazon* Court held that California's bingo laws—materially identical to Texas's laws here—fell on the regulatory side of the ledger. This Court generally assumes that, when Congress enacts statutes, it is aware of this Court's relevant precedents. *Ryan* v. *Valencia Gonzales,* 568 U. S. 57, 66. At the time Congress adopted the Restoration Act, *Cabazon* was not only *a* relevant precedent; it was *the* precedent. In *Cabazon*'s immediate aftermath, Congress also adopted other laws governing tribal gaming that appeared to reference and employ in different ways *Cabazon*'s distinction between prohibition and regulation. See, *e.g.*, Wampanoag Tribal Council of Gay Head, Inc., Indian Claims Settlement Act of 1987, §9, 101 Stat. 709–710.

None of this is to say that the Tribe may offer gaming on whatever terms it wishes. The Restoration Act provides that a gaming activity prohibited by Texas law is also prohibited on tribal land as a matter of federal law. Other gaming activities are subject to tribal regulation and must conform to the terms and conditions set forth in federal law, including IGRA to the extent applicable. Pp. 12–15.

(c) The State's remaining arguments are unavailing. Pp. 15–19.

Syllabus

(1) Texas asks the Court to focus on subsection (a) of the Restoration Act, which ends with the statement that "[t]he provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T. C.–02–86." 101 Stat. 668–669. In that referenced resolution, the Tribe announced its opposition to Texas's legislative efforts to have its gaming laws apply on tribal lands. At the same time, the Tribe also announced its own intention to prohibit gaming on its reservation and authorized the acceptance of federal legislation prohibiting gaming on tribal lands. Texas claims that the reference to the tribal resolution suggests the Restoration Act should be read "broadly" to allow Texas to apply its gaming regulations on tribal lands. As an initial matter, subsection (a) does not purport to incorporate that resolution into federal law—something Congress knows how to do when it wishes, see *e.g.*, 25 U. S. C. §5396(b). In addition, Texas's "broad" reading suffers from the same interpretative challenges already mentioned and defies Congress's apparent adoption of *Cabazon*'s prohibitory/regulatory distinction. Finally, on this Court's interpretation of the Restoration Act, Congress *did* legislate "in accordance with" the Tribe's resolution by expressly granting the Tribe federal recognition and choosing not to apply Texas gaming regulations as surrogate federal law on tribal land. Pp. 15–18.

(2) Texas appeals to public policy and argues that attempts to distinguish between prohibition and regulation are sure to prove "unworkable." It is not, however, this Court's place to question whether Congress adopted the wisest or most workable policy. That the Restoration Act's prohibitory/regulatory distinction can and will generate borderline cases hardly makes it unique among federal statutes. And courts have applied the same prohibitory/regulatory framework for decades under Public Law 280. Moreover, Texas's alternative interpretation poses its own "workability" challenges, as federal courts would be charged with enforcing the minutiae of state gaming regulations governing the conduct of permissible games. Pp. 18–19.

955 F. 3d 408, vacated and remanded.

GORSUCH, J., delivered the opinion of the Court, in which BREYER, SOTOMAYOR, KAGAN, and BARRETT, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which THOMAS, ALITO, and KAVANAUGH, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–493

YSLETA DEL SUR PUEBLO, ET AL., PETITIONERS *v.* TEXAS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 15, 2022]

JUSTICE GORSUCH delivered the opinion of the Court.

Native American Tribes possess "inherent sovereign authority over their members and territories." *Oklahoma Tax Comm'n* v. *Citizen Band Potawatomi Tribe of Okla.*, 498 U. S. 505, 509 (1991). Under our Constitution, treaties, and laws, Congress too bears vital responsibilities in the field of tribal affairs. See, *e.g.*, *United States* v. *Lara*, 541 U. S. 193, 200 (2004). From time to time, Congress has exercised its authority to allow state law to apply on tribal lands where it otherwise would not. See *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 60 (1978); *Bryan* v. *Itasca County*, 426 U. S. 373, 392 (1976); *Rice* v. *Olson*, 324 U. S. 786, 789 (1945). In this case, Texas contends that Congress expressly ordained that all of its gaming laws should be treated as surrogate federal law enforceable on the Ysleta del Sur Pueblo Reservation. In the end, however, we find no evidence Congress endowed state law with anything like the power Texas claims.

## I

### A

The Ysleta del Sur Pueblo is one of three federally recognized Indian Tribes in Texas. Its reservation lies near El Paso, and the Tribe today includes over 4,000 enrolled members. See About Us, Ysleta del Sur Pueblo (June 2022), https://www.ysletadelsurpueblo.org/about-us. The Tribe traces its roots back to the 1680 Pueblo Revolt against the Spanish in New Mexico. In the revolt's aftermath, the Spanish retreated from Santa Fe to El Paso, and a large number of Ysleta Pueblo Indians accompanied them. S. Rep. No. 100–90, p. 6 (1987) (Senate Report); W. Timmons, El Paso 18 (1990) (Timmons). Soon, tribal members built the Ysleta Mission, the oldest church in Texas, and in 1751 Spain granted 23,000 acres to the Tribe for its homeland. See Senate Report 6–7; Timmons 36.

Things changed for the Tribe after Texas gained statehood in 1845. The State disregarded Spain's land grant and began incorporating a town on tribal lands and issuing land patents to non-Indians. Senate Report 6–7. Over the years that followed, the Tribe repeatedly lost lands "without recompense." Timmons 181. Yet some tribal members remained on parts of their homeland, "determin[ed] to preserve [their] language, customs, and traditions." *Ibid.* In the late 1890s, the Tribe adopted a constitution to ensure "the survival of [its] ancient tribal organization." *Ibid.* After years of struggle, the Tribe also won formal recognition from Texas in 1967 and Congress the following year. *Id.*, at 260–261. In its 1968 legislation, Congress assigned its trust responsibilities for the Tribe to Texas. 82 Stat. 93. That trust relationship was important, as it ensured the Tribe would retain the remaining 100 acres of land it possessed and gain access to certain tribal funding programs. See Timmons 261; see also R. Chambers, Judicial Enforcement of the Federal Trust Responsibility to Indians, 27

Stan. L. Rev. 1213, 1233–1234 (1975) (discussing trust obligations).

This arrangement persisted until 1983. That year, Texas renounced its trust responsibilities, asserting that they were inconsistent with the State's Constitution. See 2019 WL 639971, *1 (WD Tex., Feb. 14, 2019). The Tribe responded to this development by seeking new congressional legislation to reestablish its trust relationship with the federal government. But that effort quickly became bogged down in a dispute. Of all things, it concerned bingo. Texas, it seems, worried that allowing tribal gaming would have a detrimental effect on "existing charitable bingo operations in the State of Texas." App. to Pet. for Cert. 121. And because Texas judged that its laws would be inapplicable on tribal lands without federal approval, the State opposed any new federal trust legislation unless it included a special provision permitting it to apply its own gaming laws on the Tribe's lands. See *ibid.*

B

Years of negotiations ensued. But one development during this period turned out to have particular salience even though it did not immediately concern either the Tribe or Texas. In February 1987, this Court issued *California* v. *Cabazon Band of Mission Indians*, 480 U. S. 202. In it, the Court addressed Public Law 280, a statute Congress had adopted in 1953 to allow a handful of States to enforce some of their criminal—but not certain of their civil—laws on particular tribal lands. See *Bryan*, 426 U. S., at 383–385. Seeking to apply that statutory direction in the context of Indian gaming, the Court held that, if a state law *prohibits* a particular game, it falls within Public Law 280's grant of criminal jurisdiction and a State may enforce its ban on tribal lands. *Cabazon*, 480 U. S., at 209–210. But if state laws merely *regulate* a game's availability, the Court ruled, Public Law 280 does not permit a State to enforce its rules

on tribal lands. See *id.*, at 210–211.

The Court then turned to apply this prohibitory/regulatory distinction to California's bingo laws. Much like Texas today, California in 1987 permitted bingo in various circumstances (including for charitable purposes), but treated deviations from its rules as criminal violations. See *id.*, at 205, 208–209. Because California allowed *some* bingo to be played, the Court reasoned, the State "regulate[d] rather than prohibit[ed]" the game. *Id.*, at 211. From this, it followed that Public Law 280 did not authorize the State to apply its own bingo laws on tribal lands. *Id.*, at 210–211. In reaching this conclusion, the Court rejected California's suggestion that its laws were prohibitory rather than regulatory because they were enforceable by criminal sanctions, explaining that "an otherwise regulatory law" is not enforceable under Public Law 280 merely because a State labels it "criminal." *Id.*, at 211. "Otherwise," the Court explained, Public Law 280's "distinction" between criminal and civil laws "could easily be avoided." *Ibid.*

It appears the Court's decision helped catalyze new legislation. After *Cabazon*, "congressional efforts to pass [Indian gaming] legislation . . . that had been ongoing since 1983 gained momentum, with Indian tribes' position strengthened." W. Wood, The (Potential) Legal History of Indian Gaming, 63 Ariz. L. Rev. 969, 1027, and n. 353 (2021) (Wood). In fact, just six months after the decision, in August 1987, Congress finally adopted the Ysleta del Sur and Alabama and Coushatta Indian Tribes of Texas Restoration Act, 101 Stat. 666 (Restoration Act). In that law, Congress restored the Tribe's federal trust status. And to resolve Texas's gaming objections, Congress seemingly drew straight from *Cabazon*, employing its distinction between prohibited and regulated gaming activity. The Restoration Act "prohibited" as a matter of federal law "[a]ll gaming activities which are prohibited by the laws of the State of Texas." 101 Stat. 668. But the Act also provided

that it should not be "construed as a grant of civil or criminal regulatory jurisdiction to the State of Texas." *Id.*, at 669.

That was not all Congress did. Because *Cabazon* left certain States unable to apply their gaming regulations on Indian reservations, some feared the Court's decision opened the door to a significant amount of new and unregulated gaming on tribal lands. See R. Anderson, S. Krakoff, & B. Berger, American Indian Law: Cases and Commentary 479–480 (4th ed. 2020) (Anderson). In 1988, Congress sought to fill that perceived void by adopting its own comprehensive national legislation: the Indian Gaming Regulatory Act (IGRA), 102 Stat. 2467, 25 U. S. C. § 2701 *et seq.*; Anderson 479–482. IGRA established rules for three separate classes of games. Relevant here, the law permitted Tribes to offer so-called class II games—like bingo—in States that "permi[t] such gaming for any purpose by any person, organization or entity." § 2710(b)(1)(A). Meanwhile, the statute allowed Tribes to offer class III games— like blackjack and baccarat—but only pursuant to tribal/state compacts. § 2703(8); Anderson 480. To ensure compliance with the statute's terms, IGRA created the National Indian Gaming Commission. § 2704(a).

C

In the 1990s, the Tribe sought to negotiate a compact with Texas to offer class III games pursuant to IGRA. But Texas refused to come to the table. It argued that the Restoration Act displaced IGRA and required the Tribe to follow all of the State's gaming laws on tribal lands.

That dispute quickly found its way to court. Initially, a federal district court granted summary judgment for the Tribe, holding that Texas violated IGRA by failing to negotiate in good faith. On appeal, however, the Fifth Circuit reversed. That court held that the Restoration Act's directions superseded IGRA's and guaranteed that all of "Texas'

gaming laws and regulations" would "operate as surrogate federal law on the Tribe's reservation." *Ysleta del Sur Pueblo* v. *Texas*, 36 F. 3d 1325, 1326, 1334 (1994) (*Ysleta I*).

A quarter century of confusion and litigation followed. Repeatedly, the Tribe sought to conduct gaming operations within the confines of *Ysleta I* at its Speaking Rock Entertainment Center, which houses restaurants, bars, and concert venues. Repeatedly, Texas argued that the Tribe's activities exceeded the Fifth Circuit's mandate. Faced with these disputes, lower courts experimented with a variety of approaches: enjoining all on-reservation gaming, instructing the Tribe to seek licenses from Texas regulators, and even requiring the Tribe to obtain preapproval from a federal court before offering any new gaming operations. One court described this process as having "transformed [it] into a quasi-regulatory body overseeing and monitoring the minutiae of the [Tribe's] gaming-related conduct." *Texas* v. *Ysleta del Sur Pueblo*, 2016 WL 3039991, *19 (WD Tex., May 27, 2016).

D

The current case represents just the latest in this long line. In 2016, the Tribe began offering bingo. On its view, it was free to offer at least this game because IGRA treats bingo as a class II game for which no state permission is required so long as the State permits the game to be played on some terms by some persons. See 25 U. S. C. § 2710(b)(1)(A). Citing IGRA, the Tribe did not just offer the sort of bingo played in church halls across the country. It also offered "electronic bingo," a game in which patrons sit at "machines [that] look similar to a traditional slot machine." 2019 WL 639971, *5 (internal quotation marks omitted). Unlike typical slot machines, however, "the underlying game is run using historical bingo draws." *Ibid.*

The State responded by seeking to shut down all of the Tribe's bingo operations. Whatever IGRA may allow, Texas

argued, the Fifth Circuit was clear in *Ysleta I* that the Restoration Act forbids the Tribe from defying any of the State's gaming regulations. And, Texas stressed, under its laws bingo remains permissible today only for charitable purposes and only subject to a broad array of regulations.

Finding itself bound by *Ysleta I*, the District Court sided with Texas and enjoined the Tribe's bingo operations. But the court also chose to stay its injunction pending appeal. The court did so because it thought that either the Fifth Circuit or this Court might wish to reconsider *Ysleta I*. See 2019 WL 5589051, *1 (WD Tex., Mar. 28, 2019). After all, the Restoration Act effectively federalizes only those state laws that *prohibit* gaming activities. The statute expressly states that nothing in it may be read as authorizing Texas to enforce criminal or civil *regulations* on tribal lands. And when it comes to bingo, the State permits at least some forms of the game subject to regulation. In the District Court's judgment, "the Tribe [had] a sufficient likelihood of success on the merits" under the terms of the Restoration Act "to support a stay." *Ibid.* The District Court further found that, without a stay, the injury to the Tribe would be "truly irreparable." *Id.*, at *2. Speaking Rock's revenues account for 60 percent of the Tribe's operating budget, which supports "significant educational, governmental, and charitable initiatives." *Ibid*; Brief for Petitioners 17. And when Speaking Rock closed due to one of the many previous disputes, tribal unemployment rose from 3 to 28 percent. See *id.*, at 18.

On appeal, the Fifth Circuit "re-reaffirm[ed]" *Ysleta I* and held that the decision "resolve[d] this dispute." 955 F. 3d 408, 414, 417 (2020). *Ysleta I* expressly held that all of "Texas' gaming laws and regulations . . . operate as surrogate federal law on the Tribe's reservation." 955 F. 3d, at 414 (emphasis deleted). And because the Tribe's bingo operations did not conform to the State's bingo regulations, the court held, they were impermissible. *Ibid.*

After the Tribe filed a petition for certiorari, this Court called for the views of the Solicitor General. The United States argued that the Fifth Circuit's understanding of the Restoration Act took a wrong turn in *Ysleta I* and urged us to correct the error. See Brief for United States as *Amicus Curiae* on Pet. for Cert. 1. Ultimately, we agreed to take up this case to consider that question. 595 U. S. ___ (2021).

## II

## A

Before us, the parties offer two very different accounts of the Restoration Act. The State, in its only argument in support of regulatory jurisdiction over the Tribe's gaming activities, reads the Act as effectively subjecting the Tribe to the entire body of Texas gaming laws and regulations, just as the Fifth Circuit held in *Ysleta I*. The Tribe understands the Act to bar it from offering only those gaming activities the State fully prohibits. Consistent with *Cabazon*, the Tribe submits, if Texas merely regulates a game like bingo, it may offer that game—and it may do so subject only to the limits found in federal law and its own law, not state law.

To resolve the parties' disagreement, we turn to § 107 of the Restoration Act, where Congress directly addressed gaming on the Tribe's lands and said this:

## "SEC. 107. GAMING ACTIVITIES.

(a) IN GENERAL.—All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe. Any violation of the prohibition provided in this subsection shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas. The provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.C.–02–86 which was approved and certified on March 12, 1986.

(b) NO STATE REGULATORY JURISDICTION.—Nothing in this

section shall be construed as a grant of civil or criminal regulatory jurisdiction to the State of Texas.

(c) JURISDICTION OVER ENFORCEMENT AGAINST MEMBERS.— [T]he courts of the United States shall have exclusive jurisdiction over any offense in violation of subsection (a) that is committed by the tribe . . . ."  101 Stat. 668–669.

Perhaps the most striking feature about this language is its dichotomy between prohibition and regulation.  On the one hand, subsection (a) says that gaming activities *prohibited* by state law are also prohibited as a matter of federal law (using some variation of the word "prohibited" no fewer than three times).  On the other hand, subsection (b) insists that the statute does not grant Texas civil or criminal *regulatory* jurisdiction with respect to matters covered by this "section," a section concerned exclusively with gaming.  The implication that Congress drew from *Cabazon* and meant for us to apply its same prohibitory/regulatory framework here seems almost impossible to ignore.  See Part II–B, *infra*.

But before getting to that, we start with a careful look at the statute's terms standing on their own.  Often enough in ordinary speech, to *prohibit* something means to "forbid," "prevent," or "effectively stop" it, or "make [it] impossible."  Webster's Third International Dictionary 1813 (1986) (Webster's Third); see 7 Oxford English Dictionary 596 (2d ed. 1989) (OED); Black's Law Dictionary 1212 (6th ed. 1990) (Black's).  Meanwhile, to *regulate* something is usually understood to mean to "fix the time, amount, degree, or rate" of an activity "according to rule[s]."  Webster's Third 1913; see 8 OED 524; Black's 1286.  Frequently, then, the two words are "not synonymous."  *Id.*, at 1212.

That fact presents Texas with a problem.  The State concedes that its laws do not forbid, prevent, effectively stop, or make bingo impossible.  Instead, the State admits that it

allows the game subject to fixed rules about the time, place, and manner in which it may be conducted. See Brief for Respondent 5. From this alone, it would seem to follow that Texas's laws fall on the regulatory rather than prohibitory side of the line—and thus may not be applied on tribal lands under the terms of subsection (b).

To be sure, Texas is not without a reply. It observes that in everyday speech someone could describe its laws as "prohibiting" bingo *unless* the State's time, place, and manner regulations are followed. After all, conducting bingo or any other game in defiance of state regulations can lead not just to a civil citation, but to a criminal prosecution too. See Tex. Occ. Code Ann. § 2001.551(c) (West 2019). In this sense, the State submits, it seeks to do exactly what subsection (a) allows—"prohibit" bingo that is not conducted for charitable purposes and compliant with all its state gaming regulations.

That much we find hard to see. Maybe in isolation or in another context, Texas's understanding of the word "prohibit" would make sense. But here it risks rendering the Restoration Act a jumble. No one questions that Texas "regulates" bingo by fixing the time, place, and manner in which the game may be conducted. The State submits only that, in some sense, its laws *also* "prohibit" bingo—when the game fails to comply with the State's time, place, and manner regulations. But on that reading, the law's dichotomy between prohibition and regulation collapses. Laws regulating gaming activities *become* laws prohibiting gaming activities. It's an interpretation that violates our usual rule against "ascribing to one word a meaning so broad" that it assumes the same meaning as another statutory term. *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 575 (1995). It's a view that defies our usual presumption that "differences in language like this convey differences in meaning." *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. ___, ___ (2017) (slip op., at 6). And perhaps most tellingly, it is a

construction that renders state gaming regulations simultaneously both (permissible) prohibitions and (impermissible) regulations. Rather than supply coherent guidance, Texas's reading of the law renders it an indeterminate mess.

The State's interpretation of subsection (a) presents another related problem. Suppose we could somehow overlook the indeterminacy its interpretation yields and adopt the State's view that it may "prohibit" bingo under subsection (a) not merely by outlawing bingo altogether but also by dictating the time, place, and manner in which it is played. On that account, subsection (b) would be left with no work to perform, its terms dead letters all. Yes, subsection (b) *says* that it does not federalize Texas's civil and criminal gaming regulations on tribal land. But, the State effectively suggests, we should turn a blind eye to all that. It's a result that defies yet another of our longstanding canons of statutory construction—this one, the rule that we must normally seek to construe Congress's work "so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley* v. *United States*, 556 U. S. 303, 314 (2009) (internal quotation marks omitted).

Seeking a way around these problems, Texas only stumbles on another. The State submits that subsection (b) performs real work even on its reading by denying its courts and gaming commission "jurisdiction" to punish violations of subsection (a) and sending disputes over "regulatory" violations to federal court instead. The dissent also embraces this approach. See *post*, at 14–15. But this understanding of subsection (b) only serves to render still *another* portion of the statute—subsection (c)—a nullity. Titled "Jurisdiction Over Enforcement Against Members," subsection (c) grants the federal courts "exclusive" jurisdiction over violations of subsection (a), and it also permits Texas to "brin[g]

an action in [federal court] to enjoin violations of [subsection (a)]." 101 Stat. 669. Put differently, subsection (c) already precludes state courts and state agencies from exercising jurisdiction over violations of subsection (a). To make any sense of the statute, subsection (b) must do something besides repeat that work.

Stepping back, a full look at the statute's structure suggests a set of simple and coherent commands. In subsection (a), Congress effectively federalized and applied to tribal lands those state laws that prohibit or absolutely ban a particular gaming activity. In subsection (b), Congress explained that it was *not* authorizing the application of Texas's gaming regulations on tribal lands. In subsection (c), Congress granted federal courts jurisdiction to entertain claims by Texas that the Tribe has violated subsection (a). Texas's competing interpretation of the law renders individual statutory terms duplicative and whole provisions without work to perform.[1]

## B

Even if fair questions remain after a look at the ordinary

---

[1] The dissent offers a surplusage argument of its own, arguing that the Court's reading of § 107 duplicates the work done by § 105(f). See *post*, at 12. That is mistaken. Section 105(f) does not specifically address tribal gaming, but instead broadly extends Public Law 280 and its associated jurisdictional rules to the Tribe's reservation. By contrast, § 107 speaks only and specifically to gaming. And while it does extend much of the Public Law 280 regime to tribal gaming, it also departs from that framework in at least two significant ways. First, § 107 incorporates Texas's criminal gaming prohibitions as surrogate *federal law*, while Public Law 280 allows particular States to apply their own laws directly to tribal lands. Second, it establishes unique jurisdictional rules for judicial review of alleged violations of Texas's gaming prohibitions. See *post*, at 13. Where Public Law 280 grants *state courts* jurisdiction over violations of state criminal prohibitory laws, subsection (c) grants *federal courts* exclusive jurisdiction over alleged violations of § 107, "[n]otwithstanding section 105(f)." There is no superfluity here.

meaning of the statutory terms before us, important contextual clues resolve them. Recall that Congress passed the Act just six months after this Court handed down *Cabazon*. See Part I–B, *supra*. In that decision, the Court interpreted Public Law 280 to mean that only "prohibitory" state gaming laws could be applied on the Indian lands in question, not state "regulatory" gaming laws. The Court then proceeded to hold that California bingo laws—laws materially identical to the Texas bingo laws before us today—fell on the regulatory side of the ledger. Just like Texas today, California heavily regulated bingo, allowing it only in certain circumstances (usually for charity). Just like Texas, California criminalized violations of its rules. Compare *Cabazon*, 480 U. S., at 205, with Tex. Occ. Code Ann. § 2001.551. Still, because California permitted some forms of bingo, the Court concluded that meant California did not prohibit, but only regulated, the game. *Cabazon*, 480 U. S., at 211.

For us, that clinches the case. This Court generally assumes that, when Congress enacts statutes, it is aware of this Court's relevant precedents. See *Ryan* v. *Valencia Gonzales*, 568 U. S. 57, 66 (2013). And at the time Congress adopted the Restoration Act, *Cabazon* was not only *a* relevant precedent concerning Indian gaming; it was *the* precedent. See Part I–B, *supra*. In *Cabazon*, the Court drew a sharp line between the terms prohibitory and regulatory and held that state bingo laws very much like the ones now before us qualified as regulatory rather than prohibitory in nature. We do not see how we might fairly read the terms of the Restoration Act except in the same light. After all, "[w]hen the words of the Court are used in a later statute governing the same subject matter, it is respectful of Congress and of the Court's own processes to give the words the same meaning in the absence of specific direction to the contrary." *Williams* v. *Taylor*, 529 U. S. 420, 434 (2000).

Even beyond that vital contextual clue lie others. In the

immediate aftermath of *Cabazon*, Congress adopted not just the Restoration Act; it also adopted other laws governing tribal gaming activities. In these laws, Congress again appeared to reference and employ *Cabazon*'s distinction between prohibition and regulation—and Congress did so in ways demonstrating that it clearly understood how to grant a State regulatory jurisdiction over a Tribe's gaming activities when it wished to do so. Cf. *Lagos* v. *United States*, 584 U. S. ___, ___–___ (2018) (slip op., at 6–7).

Consider two examples. On the same day it passed the Restoration Act, Congress adopted a statute involving the Wampanoag Tribe. But, contrary to its approach in the Restoration Act, Congress subjected that Tribe's lands to "those laws and regulations which *prohibit or regulate* the conduct of bingo or any other game of chance." Wampanoag Tribal Council of Gay Head, Inc., Indian Claims Settlement Act of 1987, § 9, 101 Stat. 709–710 (emphasis added). Shortly after the Restoration Act, Congress adopted another statute, this one governing the Catawba Tribe's gaming activities. In it, Congress provided that "all laws, ordinances, *and regulations of the State,* and its political subdivisions, *shall govern the regulation* of . . . gambling or wagering by the Tribe on and off the Reservation." Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993, § 14(b), 107 Stat. 1136 (emphasis added).

That Congress chose to use the language of *Cabazon* in different ways in three statutes closely related in time and subject matter seems to us too much to ignore. See *State Farm Fire & Casualty Co.* v. *United States ex rel. Rigsby*, 580 U. S. 26, 34 (2016) (explaining that when Congress "use[s] . . . explicit language in one provision," that "cautions against inferring the same limitation in another provision" (internal quotation marks omitted)). For two Tribes, Congress did more than just prohibit on tribal lands those gaming activities prohibited by state law. It said state regulations should apply as a matter of federal law

too. Yet for *this* Tribe Congress did something different. It did not subject the Tribe to all Texas laws that "prohibit or regulate" gaming. It did not subject the Tribe to all laws that "govern the regulation of gambling." Instead, Congress banned on tribal lands only those gaming activities "prohibited" by Texas, and it did not provide for state "regulatory jurisdiction" over tribal gaming.[2]

None of this is to say that the Tribe may offer any gaming activity on whatever terms it wishes. It is only to say that the Fifth Circuit and Texas have erred in their understanding of the Restoration Act. Under that law's terms, if a gaming activity is prohibited by Texas law it is also prohibited on tribal land as a matter of federal law. Other gaming activities are subject to tribal regulation and must conform with the terms and conditions set forth in federal law, including IGRA to the extent it is applicable. See Brief for United States as *Amicus Curiae* 31–33.[3]

## III

### A

By this point, only two arguments remain for us to consider. In the first, Texas and the dissent focus heavily on

---

[2] The dissent speculates about ways Congress could have even more clearly communicated its intention to ban only those games prohibited by Texas. See *post*, at 8–9. But rather than compare the Restoration Act to hypothetical language Congress could have used, it seems more appropriate to compare the Act's terms to language Congress did use in closely related statutes addressing precisely the same subject, including in one passed the very same day as this Act. The dissent cannot and does not deny that Congress could have employed the language it used in the Wampanoag and Catawba statutes. That Congress took a different approach strongly suggests it had in mind a different set of rules for this Tribe.

[3] In reaching this conclusion, we need not rely on the rule—long established by our precedents—that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana* v. *Blackfeet Tribe*, 471 U. S. 759, 766 (1985). On our view, Texas's interpretation fails even without recourse to that rule.

the final sentence in subsection (a). See *post*, at 9–10, 13. That sentence states that "[t]he provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.C.–02–86." 101 Stat. 668–669. In the referenced 1986 resolution, the Tribe announced its opposition to Texas's legislative efforts to have all its gaming laws apply on tribal lands. Such a result, the resolution said, would represent "a substantial infringement upon the Tribe['s] power of self-government . . . [i]nconsistent with the central purposes of restoration of the federal trust relationship." App. to Pet. for Cert. 122. At the same time, to prevent extension of Texas law to its reservation and to avoid "jeopardiz[ing]" its request for renewed federal trust status, the Tribe (1) announced its own intention to prohibit gaming or bingo on its reservation, and (2) authorized its negotiators in Washington to accept federal legislation prohibiting gaming on tribal lands as an alternative to state regulation. *Id.*, at 123. Before us, Texas does not question that the Tribe was (and remains) free to change its own laws after adopting that resolution. But, the State says, the fact that Congress referenced the tribal resolution in subsection (a) suggests that the Restoration Act should be read "broadly" to allow Texas to apply its gaming regulations on tribal lands. Brief for Respondent 22.

It's an unsatisfying suggestion for at least a few reasons. In the first place, while subsection (a) explains that the Restoration Act was "enacted in accordance with" the Tribe's resolution, it does not purport to incorporate that resolution into federal law. Congress knows exactly how to adopt into federal law the terms of another writing or resolution when it wishes. It can and has said, for example, that a tribal law or resolution "shall have the same force and effect as if it were set out in full in this subchapter." 25 U. S. C. § 5396(b). But even Texas does not suggest that Congress went that far in the Restoration Act.

With that possibility shelved, it is hard to see what's left.

Texas suggests that Congress's reference to the tribal resolution at least augurs in favor of a "broa[d]" reading of subsection (a). Brief for Respondent 22; see also *post*, at 9–10. But saying that tells us nothing about how much broader the law should be read. And, as we have seen, the only "broader" reading of subsection (a) Texas offers faces its challenges— it requires us to believe that subsection (a) swallows subsection (b) whole, makes a nullity of subsection (c), and defies Congress's apparent adoption of *Cabazon*'s prohibitory/regulatory distinction.

There is still another and maybe more fundamental problem here. On our interpretation of the Restoration Act, Congress *did* legislate "in accordance with" the Tribe's resolution: It expressly granted the Tribe federal recognition and chose not to apply Texas gaming regulations as surrogate federal law on tribal land. Of course, Congress also sought to act in accordance with at least some of Texas's concerns by banning those games fully barred by Texas law. In the end, it seems each got half a loaf.

By contrast, adopting Texas's alternative interpretation of the Restoration Act would make a mockery of Congress's statement that it sought to act "in accordance with" the Tribe's resolution. On the State's view, *all* of its gaming regulations serve as surrogate federal law applicable on tribal lands. That's a result few would dare to describe as "accord[ing] with" the tribal resolution. In fact, it's an outcome more nearly the opposite of what the Tribe sought and closer to what it described as a "wholly unsatisfactory . . . infringement upon the Tribe['s] power of self government" and "[i]nconsistent with the central purposes of restoration of the federal trust relationship." App. to Pet. for Cert. 122.

To be sure and as Texas and the dissent both highlight, the statutory terms Congress finally settled on were in some respects more generous to the Tribe than those its resolution authorized tribal negotiators in Washington to accept. Rather than ban all gaming on tribal lands, Congress

banned only those games forbidden in Texas. But this de-velopment is hardly surprising either. The Tribe adopted its resolution in 1986 in connection with negotiations over a bill that eventually died in the Senate. See Brief for United States as *Amicus Curiae* 3–4, 30. As talks continued the following year, this Court issued *Cabazon*. And after that, as we have seen, Tribes across the country saw their negotiating "position strengthened." Wood 1027, and n. 353; see also Part I–B, *supra*. The dissent omits these es-sential details from its account of how the Restoration Act became law. See *post*, at 3. That omission leads the dissent to overlook one plausible explanation for why the Tribe got the deal it did. It may be that, thanks to *Cabazon*, the Tribe's representatives were able to persuade Congress to impose a less draconian ban—one that paralleled the terms this Court in *Cabazon* found applicable to many other Tribes under Public Law 280. Surely, too, as we have seen, if Congress had intended a more complete federal ban, it could have easily said so. Not by obliquely referencing a tribal resolution, but by saying so clearly, just as it did for both the Wampanoag and Catawba Tribes. See Part II–B, *supra*.[4]

### B

In the end, Texas retreats to the usual redoubt of failing statutory interpretation arguments: an unadorned appeal to public policy. Echoing arguments voiced by the *Cabazon*

---

[4] The dissent tries to reshape the tribal resolution to its liking by dis-tilling it down to a "single 'request[]'" to "ban on the reservation all gam-ing as defined by Texas." *Post*, at 3, 9. And it chides the Court for con-sulting "excerpts from the Resolution's preamble" that complicate the dissent's narrative. *Post*, at 10. But the *entire document* is an expression of the Tribe's views. If we are to rely on the resolution as a snapshot of the Tribe's position, it makes little sense to ignore much of it. In any event, courts regularly consult preambles and recitals even in statutes and contracts. See A. Scalia & B. Garner, Reading Law 217–220 (2012).

dissent, the State argues that attempts to distinguish be-
tween prohibition and regulation are sure to prove "un-
workable." Brief for Respondent 29 (citing 480 U. S., at 224
(opinion of Stevens, J.)). Indeed, the State suggests that
problems are likely to arise in this very case. Under our
reading, Texas highlights, courts on remand might be called
on to decide whether "electronic bingo" qualifies as "bingo"
and thus a gaming activity merely regulated by Texas, or
whether it constitutes an entirely different sort of gaming
activity absolutely banned by Texas and thus forbidden as
a matter of federal law. And, the State worries, any at-
tempt to answer that question may require evidence, expert
testimony, and further litigation.

We appreciate these concerns, but they do not persuade
us. Most fundamentally, they are irrelevant. It is not our
place to question whether Congress adopted the wisest or
most workable policy, only to discern and apply the policy
it did adopt. If Texas thinks good governance requires a
different set of rules, its appeals are better directed to those
who make the laws than those charged with following them.

Even on its own terms, we are not sure what to make of
Texas's policy argument. We do not doubt that the Resto-
ration Act's prohibitory/regulatory distinction can and will
generate borderline cases. See F. Cohen, Handbook of Fed-
eral Indian Law 541–544 (N. Newton ed. 2012). It may even
be that electronic bingo will prove such a case. But if ap-
plying the Act's terms poses challenges, that hardly makes
it unique among federal statutes. Nor is the line the Resto-
ration Act asks us to enforce quite as unusual as Texas sug-
gests. Courts have applied the same prohibitory/regulatory
framework elsewhere in this country under Public Law 280
for decades. See *id.*, at 541–547. IGRA, too, draws a similar
line to assess the propriety of class II gaming on Indian res-
ervations nationwide. See 25 U. S. C. § 2710(b)(1)(A); see
also K. Washburn, Federal Law, State Policy, and Indian
Gaming, 4 Nev. L. J. 285, 289–290 (2004). In fact, Texas

concedes that another Tribe within its borders—the Kicka-poo Traditional Tribe of Texas—is already subject to IGRA and offers class II games.  See Tr. of Oral Arg. 91; see also Brief for United States as *Amicus Curiae* 32.  Why some-thing like the *Cabazon* test can work for one Tribe in Texas but not another is not exactly obvious.

For that matter, Texas's alternative interpretation poses its own "workability" challenges.  Under the State's read-ing, subsection (c) does not just charge federal courts with enforcing on tribal lands a federal law banning gaming ac-tivities also banned by state law.  It also charges federal courts with enforcing the minutiae of state gaming regula-tions governing the conduct of permissible games—a role usually played by state gaming commissions or the Na-tional Indian Gaming Commission.  It's a highly unusual role for federal courts to assume.  But on Texas's view, it's a role federal courts *must* assume, as indeed they have sought to do since *Ysleta I.*  And far from yielding an easily administrable regime, by almost anyone's account that pro-ject has engendered a quarter century of confusion and dis-pute.  See Part I–C, *supra.*

\*

Texas contends that Congress in the Restoration Act has allowed all of its state gaming laws to act as surrogate fed-eral law on tribal lands.  The Fifth Circuit took the same view in *Ysleta I* and in the proceedings below.  That under-standing of the law is mistaken.  The Restoration Act bans as a matter of federal law on tribal lands only those gaming activities also banned in Texas.  To allow the Fifth Circuit to revise its precedent and reconsider this case in the cor-rect light, its judgment is vacated, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

# SUPREME COURT OF THE UNITED STATES

─────────────

No. 20–493

─────────────

## YSLETA DEL SUR PUEBLO, ET AL., PETITIONERS *v.* TEXAS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 15, 2022]

CHIEF JUSTICE ROBERTS, with whom JUSTICE THOMAS, JUSTICE ALITO, and JUSTICE KAVANAUGH join, dissenting.

In order to obtain federal trust status, the Ysleta del Sur Pueblo Tribe agreed that Texas's gambling laws should apply on its reservation. Congress passed a bill codifying this arrangement. The key statutory provision states, "[a]ll gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe." Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act, §107(a), 101 Stat. 668 (Restoration Act). The Tribe now wishes to engage in various high-stakes gaming activities that would clearly violate Texas law—if Texas law applies. The question presented in this case is whether all of Texas's gaming laws apply on tribal land, or only those laws that categorically ban a particular game.

The Court today concludes that the latter reading of the statute is the better one. I disagree. A straightforward reading of the statute's text makes clear that *all* gaming activities prohibited in Texas are also barred on the Tribe's land. The Court's contrary interpretation is at odds with the statute's plain meaning, conflicts with an unambiguous tribal resolution that the Act was "enacted in accordance with," *id.,* at 668–669, and makes a hash of the statute's structure. The Court's approach also winds up treating

gambling violations more leniently than other violations of Texas law. This makes little sense, as the whole point of the provision at issue was to further restrict gaming on the Tribe's lands. I respectfully dissent.

## I

## A

The Ysleta del Sur Pueblo Tribe sits on a 100-acre reservation near El Paso, Texas. The Tribe first received federal recognition in 1968. At that time, Congress simultaneously transferred the United States' trust responsibilities to the State of Texas. See Tiwa Indians Act of 1968, Pub. L. 90–287, 82 Stat. 93. Texas thereafter held the Tribe's land in trust, and Texas law applied in full on the reservation.

The situation became tenuous, however, in 1983. That year Texas's Attorney General issued an opinion concluding that the State's trust relationship with a similarly situated Tribe violated the Texas Constitution. This led to a great deal of uncertainty about the Pueblo's future. Efforts began to establish, for the first time, a direct trust relationship between the Tribe and the Federal Government. But a key sticking point soon emerged: the status of gaming on the reservation.

Texas has long maintained strict controls on gambling. Indeed, since 1876 the Texas Constitution has required the State's legislature to "pass laws prohibiting" such activities. Art. III, §47; see also *Fort Worth* v. *Rylie*, 602 S. W. 3d 459, 460 (Tex. 2020). While the Texas Constitution now contains limited exceptions for charitable bingo and raffles, as well as the State's official lottery, its ban on casino-style gaming remains absolute. With the Pueblo seeking federal trust status, Texas officials worried that if the State's gaming laws no longer applied on tribal lands, the Tribe's small reservation might soon become a large hub for high-stakes gaming.

In 1985, Congress considered a bill that would have

granted the Pueblo federal trust status. The bill also would have authorized gaming on the Tribe's land, so long as it occurred "pursuant to a tribal ordinance or law" that had been "approved by the Secretary of the Interior." H. R. 1344, §107, 99th Cong., 1st Sess., 15. The bill passed the House of Representatives but stalled in the Senate due to opposition from Texas state officials and members of the Texas congressional delegation. They were concerned that the bill "did not provide adequate protection against high stakes gaming operations on the Tribe's reservation." *Texas* v. *Ysleta del Sur Pueblo*, 220 F. Supp. 2d 668, 677 (WD Tex. 2001).

In response, the Tribe adopted a resolution, which is of central importance to this case. See Tribal Resolution No. TC–02–86 (Mar. 12, 1986), App. to Pet. for Cert. 121–124. The resolution's preamble contains a series of prefatory clauses. One states that the Tribe has "[n]o interest in conducting high stakes bingo or other gambling operations on its reservation." *Id.,* at 121. Another says the Tribe remains "firm in its commitment to prohibit outright *any* gambling or bingo in *any* form on its reservation." *Id.,* at 123 (emphasis added). At the same time, other clauses assert the Tribe's view that proposals "to make state gaming law applicable on the reservation [are] wholly unsatisfactory" and represent a "substantial infringement upon [tribal] self government." *Id.,* at 122. Still, the Tribe concluded, "the controversy over gaming must not be permitted to jeopardize" legislation granting it federal trust status. *Id.,* at 123. So the Tribal Council made a single "request[]": that its congressional representatives amend the pending legislation to "provide that *all* gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the State of Texas, shall be prohibited on the Tribe's reservation or on tribal land." *Ibid.* (emphasis added).

The Tribe's request ultimately led to enactment of the Restoration Act, which is the statute at issue in this case.

See 101 Stat. 666; see also *Ysleta del Sur Pueblo*, 220 F. Supp. 2d, at 677–679.  The Act contains various provisions setting forth the relationship between the Tribe, the State of Texas, and the United States.  Two statutory provisions are particularly pertinent.  The first addresses general application of Texas law on the reservation, and the second addresses the more specific application of Texas's gaming laws.

First, in §105(f) of the Act, Congress made the Public Law 280 framework applicable to the Ysleta del Sur Pueblo.  101 Stat. 668.  The Tribe, Texas, and the United States all embrace this interpretation of the Act.  See Brief for Petitioners 25; Brief for Respondent 18; Brief for United States as *Amicus Curiae* 12.  Public Law 280 allows certain States to apply in full their criminal laws, and some of their civil laws, on tribal lands.  See *Bryan* v. *Itasca County*, 426 U. S. 373 (1976); see also *ante,* at 3–4.  The law was designed to address "the problem of lawlessness on certain Indian reservations."  *Bryan*, 426 U. S., at 379.  In *California* v. *Cabazon Band of Mission Indians*, 480 U. S. 202 (1987), the Court interpreted Public Law 280 to mean that state laws that are "'criminal/prohibitory'" apply on designated reservations, whereas those laws that are merely "'civil/regulatory'" do not, *id.,* at 209.  Put differently, we said, "if the intent of a state law is generally to prohibit certain conduct, it falls within Pub. L. 280's grant of criminal jurisdiction [to the State], but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub. L. 280 does not authorize its enforcement on an Indian reservation."  *Ibid.*  Because §105(f) grants Texas Public Law 280 authority on Pueblo lands, the State may directly enforce all of its laws that generally prohibit conduct.

Second, Congress adopted a more specific rule to govern gaming on the reservation, which is set forth at §107 of the Restoration Act.  The provision has three parts.  Section

107(a) begins with the primary rule. It states unequivocally that "[a]ll gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe." 101 Stat. 668. It continues by noting that this rule was "enacted in accordance with the tribe's request in Tribal Resolution No. T.C.–02–86." *Id.,* at 669.

The next part, §107(b), says that the section's prohibition on gaming on the reservation should not be construed as a "grant of civil or criminal regulatory jurisdiction to the State of Texas." *Ibid.*

Finally, §107(c) clarifies how the gaming provision is to be enforced: "Notwithstanding section 105(f), the courts of the United States"—rather than Texas courts—"shall have exclusive jurisdiction over any offense in violation of [§107(a)]." *Ibid.* "However," §107(c) continues, "nothing in this section shall be construed as precluding the State of Texas from bringing an action in the courts of the United States to enjoin violations of the provisions of this section." *Ibid.* This means that—unlike most state laws that apply on tribal land, which Texas can directly enforce given its authority under §105(f)—Texas cannot directly enforce its gaming laws in state court. Instead, if Texas determines the Tribe is conducting prohibited gaming activities, it must seek relief by way of a federal-court injunction.

B

It was not long before things wound up in federal court. The Pueblo sued first. Although the Tribe had previously expressed its "firm" "commitment to prohibit outright any gambling or bingo in any form on its reservation," App. to Pet. for Cert. 123, it now wished to host a bonanza of high-stakes, casino-style games, including baccarat, blackjack, craps, roulette, and more, *Ysleta del Sur Pueblo Tribe* v. *Texas*, 36 F. 3d 1325, 1331, n. 12 (CA5 1994). The dispute made its way to the Fifth Circuit, which ruled against the

Tribe. The court held that through the Restoration Act, "Congress—and the Tribe—intended for Texas' gaming laws and regulations to operate as surrogate federal law on the Tribe's reservation in Texas." *Id.*, at 1334. The Tribe was thus required to follow all of Texas's gaming rules unless it could persuade Congress to repeal the Restoration Act. We denied certiorari. 514 U. S. 1016 (1995).

For more than 25 years, this straightforward interpretation of the Restoration Act held. Yet the Tribe continually pushed the Act's limits, resulting in numerous successful requests for injunctive relief from Texas to enforce its gaming laws. See, *e.g.*, 955 F. 3d 408, 412 (CA5 2020). In several instances, federal courts had to hold tribal officials in contempt for disregarding injunctions. *Ibid.*

The present litigation traces back to 2016. After a District Court enjoined illegal "'sweepstakes'" games being conducted by the Pueblo, the Tribe announced it would be "'transitioning to bingo.'" *Ibid.* As noted, Texas outlaws almost all gambling, though it does permit charitable bingo activities in certain limited situations.

In 2017, Texas inspected the Pueblo's Speaking Rock Entertainment Center to determine whether it was complying with state law. The answer appeared to be "no." Slot machines are outlawed in Texas, as are "gambling device versions of bingo." Tex. Penal Code Ann. §47.01(4)(A) (West 2011); see also §47.02(a)(3) (West Supp. 2021). Yet inside the Tribe's casino, officials found more than 2,000 machines that looked exactly like "'Las-Vegas-style slot machines.'" 955 F. 3d, at 412. Players press a button, graphics spin, noise plays, and eventually players learn whether they have won or lost. The machines are accessible 24 hours a day and, for added effect, are emblazoned with names like "Big Texas Payday," "Welcome to Fabulous Las Vegas," and "Lucky Duck." 2019 WL 639971, *5 (WD Tex., Feb. 14, 2019). Although the machines resemble slot machines in every relevant respect, the Tribe insisted they were a form

of bingo, because whether a player wins turns on "historical bingo draws." *Ibid.*[1]

In addition to these electronic gaming machines, the Tribe also offered live-called bingo 24 hours a day. But the conditions under which these actual bingo games were conducted violated Texas law in many ways. See Tex. Occ. Code Ann. §2001.419 (West Supp. 2021) (setting forth certain bingo restrictions).

Texas filed suit in federal court seeking injunctive relief against the Tribe and tribal officials. The District Court granted an injunction, holding that "the Tribe's bingo operations fail to comply with Texas law." 2019 WL 639971, *11. The Fifth Circuit affirmed, concluding that in exchange for federal trust status, "the Pueblo agreed that its gaming activities would comply with Texas law," including all of the State's gaming regulations. 955 F. 3d, at 410. We granted certiorari. 595 U. S. \_\_\_ (2021).

## II

At this point in the litigation, the Tribe does not argue that all of its gaming activities are consistent with Texas law. Rather, it insists that Texas's gaming laws simply do not apply to it, unless Texas categorically bans the playing of a particular type of game altogether. The Tribe does not make this argument based primarily on the text or structure of the statute. It instead relies on *Cabazon Band of Mission Indians*, 480 U. S. 202, which interpreted Public Law 280. The Tribe asks us to treat §107 of the Restoration Act as implicitly adopting *Cabazon Band*'s framework, which distinguishes between laws that are "'criminal/prohibitory'" and laws that are "'civil/regulatory.'" *Id.*, at 209. Under this framework, state laws that totally prohibit a

---

[1] A photograph from the record of this version of "bingo" is appended to this opinion. It confirms that the electronic bingo played at the Speaking Rock Entertainment Center is about as close to real bingo as Bingo the famous dog.

type of activity apply on tribal land, while state laws that
simply regulate the activity do not.  And as the Tribe sees
it, Texas does not ban the playing of bingo under *all* circum-
stances, so none of the State's restrictions on the game ap-
ply.

The Court today accepts the Tribe's position, but I am not
persuaded.

## A

### 1

I begin with the statute's plain text.  Section 107(a) pro-
vides:

> "All gaming activities which are prohibited by the
> laws of the State of Texas are hereby prohibited on the
> reservation and on lands of the tribe.  Any violation of
> the prohibition provided in this subsection shall be sub-
> ject to the same civil and criminal penalties that are
> provided by the laws of the State of Texas.  The provi-
> sions of this subsection are enacted in accordance with
> the tribe's request in Tribal Resolution No. T.C.–02–86
> which was approved and certified on March 12, 1986."
> 101 Stat. 668–669.

The best reading of this statute is that all of Texas's gam-
bling rules apply in full on the Tribe's land.  "All" gaming
activities prohibited by Texas are prohibited on the reser-
vation.  "Any" violation is subject to the same penalties that
Texas would ordinarily impose.

The Tribe posits that this plain text may be read to refer
only to the banning of entire games—such as poker, bacca-
rat, or roulette.  See Brief for Petitioners 27–28.  But had
Congress wished to adopt this narrower definition of "gam-
ing activities," it easily could have done so.  For example, it
could have referred to "types of gambling," or mentioned
that the prohibition would apply only if Texas "flatly," "cat-
egorically," or "completely" banned a particular type of

game.  Congress did not do so.

2

Further textual evidence points decisively in the same di-
rection.  Section 107(a) says that it was "enacted in accord-
ance with the tribe's *request* in Tribal Resolution No. T.C.–
02–86."  101 Stat. 668–669 (emphasis added).  As noted
above, the Tribal Resolution contains just a single "re-
quest[]": that Congress enact "language which would pro-
vide that all gaming, gambling, lottery, or bingo, as defined
by the laws and administrative regulations of the State of
Texas, shall be prohibited on the Tribe's reservation or on
tribal land."  App. to Pet. for Cert. 123.  This language is
categorical.  So the breadth of the Tribe's request, and Con-
gress's clear statement that it enacted §107(a) in accord-
ance with that request, strongly indicate that Congress in-
tended to ban "all" gaming activities—"as defined by"
Texas—that are inconsistent with Texas law.[2]

The Court does not view the Tribal Resolution as signifi-
cant because Congress did not "purport to incorporate [it]
into federal law."  *Ante*, at 16.  But this is not mere legisla-
tive history; it is statutory text.  *Congress* told us exactly
why it did what it did: It was acting in accord with the
Tribe's request that it ban on the reservation all gaming as
defined by Texas.

The Court says that "Congress *did* legislate 'in accord-
ance with' the Tribe's resolution" because it "expressly
granted the Tribe federal recognition and chose not to apply

_____
[2] The Court argues that we omit "essential details" from our account of
the tribal resolution—namely, the fact that *California* v. *Cabazon Band
of Mission Indians*, 480 U. S. 202 (1987), was decided after the resolu-
tion's enactment but before passage of the Restoration Act.  *Ante*, at 18.
The Court says it is "plausible" this led to a better deal for the Tribe.
*Ibid.*  But §107(a) does not mention *Cabazon Band*.  Instead, its express
terms say the provision was "enacted in accordance with the tribe's re-
quest" in the resolution.  101 Stat. 668–669.  The resolution is therefore
the essential reference point.

Texas gaming regulations as surrogate federal law on tribal land." *Ante*, at 17. Texas, the Court suggests, should be happy to have gotten what had never been in question from the beginning—a ban on games fully barred by the State. That was its "half a loaf." *Ibid.*

In making this claim, the Court relies on cherry-picked excerpts from the resolution's preamble. But the text of §107(a) of the Restoration Act rules out the Court's analysis. Section 107(a) expressly states that the provision was "enacted in accordance with the tribe's *request* in Tribal Resolution No. T.C.–02–86." 101 Stat. 668–669 (emphasis added). As noted, the resolution contains only one single "request[]"—that Congress ban on tribal lands "*all* gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the State of Texas." App. to Pet. for Cert. 123 (emphasis added). The resolution's preamble makes up no part of this "request," so the Court's reliance on it is misplaced. "Or to put the point differently, operative provisions should be given effect as operative provisions, and prologues as prologues." *District of Columbia* v. *Heller*, 554 U. S. 570, 578, n. 3 (2008).[3]

In sum, §107(a) of the Restoration Act is best read to mean that all of Texas's gaming laws apply on the Tribe's reservation.

B

The Court rejects this straightforward interpretation of

---

[3] The Court accuses the dissent of "reshap[ing] the tribal resolution to its liking" by focusing on the Tribe's request in the resolution. *Ante*, at 18, n. 4. The reason we focus on the "request" in the tribal resolution is because that is precisely what Congress directed us to do. See 101 Stat. 668–669. Of course, as this opinion elsewhere makes clear, the resolution's preamble is emphatic in expressing the Tribe's intent to prohibit all gaming activities and its willingness to compromise on the application of state gaming law in order to secure federal trust status. See *supra*, at 3.

the statute for one main reason: It adopts the Tribe's argument that the use of the word "prohibited" in §107(a) implicitly incorporates the jurisdictional framework of Public Law 280 and *Cabazon Band*.

1

There are a number of reasons to be skeptical of this approach. *First*, Congress knew how to incorporate the Public Law 280 framework where it wished to do so. We know that because that is precisely what Congress did in §105(f) of the Restoration Act. There is little reason to think that Congress would have done so elsewhere in the very same Act with nothing more than a wink and a nudge.

*Second*, there is no evidence that Congress intended to use the word "prohibited" in §107(a) as a term of art. The word "prohibit" appears thousands of times in the U. S. Code. See Brief for Respondent 24, n. 6. The fact that our decision in *Cabazon Band* used this generic term to describe the bounds of Public Law 280 is hardly enough to turn it into a term of art with a more particularized meaning.

*Third*, the text of §107(a) of the Restoration Act bears little resemblance to the statutory language of Public Law 280. Compare 18 U. S. C. §1162 and 28 U. S. C. §1360 (setting forth provisions of Public Law 280) with §107 of the Restoration Act. Thus, this is not a situation where a more recent enactment carries with it the "old soil" of a predecessor statute or rule. See F. Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947).

*Finally*, the language used in §107 does not signal an intent to adopt *Cabazon Band*'s unique dichotomy between laws that are "'criminal/prohibitory'" and those that are "'civil/regulatory.'" 480 U. S., at 209. The Tribe points to §107(a)'s use of the word "prohibited" and §107(b)'s reference to the State lacking "regulatory jurisdiction" on tribal lands to suggest that only Texas's gaming laws that are

"criminal/prohibitory" ought to apply. 101 Stat. 669. But §107(a) also says that both Texas's "civil *and* criminal penalties" apply when the Tribe engages in prohibited gaming activities. *Id.,* at 668 (emphasis added). And §107(a) was enacted "in accordance with" the Tribal Resolution, *id.,* at 668–669, which specifies that the Restoration Act outlaws "all gaming, gambling, lottery, or bingo, as defined by the laws and *administrative regulations* of the State of Texas," App. to Pet. for Cert. 123 (emphasis added). These express references to "civil" penalties and "administrative regulations" make it unlikely that Congress intended to implicitly incorporate only Texas's gaming laws that are criminal/prohibitory. To the extent Congress legislated with *Cabazon Band*'s dichotomy in mind, the crosscutting language that Congress used suggests it intended to incorporate both types of laws.

2

The foregoing is confirmed by the structure of the Restoration Act and its statutory history. As noted above, §105(f) incorporates the Public Law 280 framework. The Tribe does not dispute this. See Brief for Petitioners 26–27. Section 107(a) then provides a more specific rule for gaming activities. This is thus the common case where "[a] specific provision"—§107(a)—"controls [over] one of more general application." *Gozlon-Peretz* v. *United States,* 498 U. S. 395, 407 (1991).

The Tribe disagrees. It argues that while §105(f) of the Restoration Act incorporated Public Law 280's *Cabazon Band* framework, §107(a) did so as well. See Brief for Petitioners 26–28. But if §105(f)—and its incorporation of *Cabazon Band*—already applied to gaming activities that were generally prohibited in Texas, there would have been no need for Congress to enact the more specific rule of §107(a). The Tribe's proffered reading of the statute thus runs headlong into the canon against surplusage. See A. Scalia & B.

Garner, Reading Law 174 (2012) (no provision "should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence" (boldface deleted)).[4]

The Tribe's preferred interpretation is especially doubtful given the history of the Restoration Act. The key roadblock to the Tribe obtaining federal trust status was a concern that it would permit gambling. The Tribe obtained federal trust status only after striking a deal on this issue. See *Ysleta del Sur Pueblo*, 220 F. Supp. 2d, at 677. It would make little sense for Congress to have enacted §107(a)'s limitations on gaming merely to duplicate the rules already set forth in §105(f). And it would make even less sense for Congress to have done so while simultaneously indicating that it was enacting the gaming prohibition "in accordance with the tribe's request," §107(a), 101 Stat. 668–669, that it ban on tribal lands "*all* gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the State of Texas"—full stop, App. to Pet. for Cert. 123 (emphasis added).

What's more, the Tribe's interpretation of §107—embraced by the Court today—leads to a bizarre result: Violations of Texas's criminal gaming prohibitions receive *more* lenient treatment than all other violations of Texas's criminal laws. Under §105(f), Texas may directly enforce in state court all of its laws that are "criminal/prohibitory." But under §107(c), Texas may enforce its gaming laws only through federal-court injunctions. This diminished enforcement authority would make sense if the full breadth of

————————
[4] In response, the Court focuses on the different treatment of Texas's gaming laws under §§107(b) and (c). See *ante*, at 12, n. 1. But the Court does not dispute that under its reading of the Restoration Act, §107(a) readopted the substantive *Cabazon Band* standard already required by §105(f), even though §105(f) comes just a few sentences earlier in the statute and uses distinct language not present in §107(a) to expressly adopt the Public Law 280 framework.

Texas's gaming prohibitions applied on tribal lands.  But in a universe where §107(a) bars no conduct beyond what §105(f) already prohibits, it would make little sense for Texas to have *less* enforcement authority over gaming when that was the only sticking point prior to passage of the Restoration Act.  This is a sure-fire sign that something has gone badly awry in the Court's interpretation of §107.

The Tribal Resolution confirms this point.  The House of Representatives passed H. R. 1344 in December 1985.  That version of the bill already contained the pertinent language applying Public Law 280 to the Tribe.  See H. R. 1344, §105(f), 99th Cong., 1st Sess., 6.  Under that regime, the Tribe would have had the same authority that other tribes had under Public Law 280 to offer games not altogether banned by a State.  But H. R. 1344 stalled in the Senate, and the Tribe adopted its resolution.  The resolution made clear that the Tribe was offering a concession that would limit its ability to offer gambling to a greater extent than under H. R. 1344 and its existing incorporation of Public Law 280.  That is why the Tribe objected that it was being unfairly "singl[ed] out . . . for treatment different than that accorded other Tribes in this country."  App. to Pet. for Cert. 123.

Still, the Tribe wanted—and needed—federal trust status, more than gambling.  In fact, the Tribe asserted in the preamble to the resolution that it had "no interest in conducting high stakes bingo or other gambling operations" and remained "firm in its commitment to prohibit outright any gambling or bingo in any form on its reservation."  *Id.*, at 121, 123.  Given its interest in federal trust status and its lack of interest in gaming, the Tribe requested that Congress "amend" H. R. 1344 to add language banning "all gaming, gambling, lottery, or bingo" on its reservation.  *Ibid.*  Since the then-existing text of H. R. 1344 already made Public Law 280 applicable to the Tribe, it is plain that the proposed addition in §107 was designed to go further.

The Court's construction of §107—as merely extending the Public Law 280 framework to gaming on Pueblo lands, and then watering down that framework through §107(c)'s limitation on remedies—is untenable.

### 3

The Tribe insists that a contrary interpretation of §107(a) would render §§107(b) and (c) meaningless, or would at least result in undue tension between those provisions and subsection (a). See, *e.g.*, Brief for Petitioners 30–31. I disagree.

The Tribe focuses primarily on §107(b). That provision states, "Nothing in this section shall be construed as a grant of civil or criminal regulatory jurisdiction to the State of Texas." 101 Stat. 669. The Tribe and Court contend that this reservation of authority shows that Congress intended to adopt the *Cabazon Band* framework. *Ante*, at 9–10. But if §107(a) simply adopted *Cabazon Band*, why would there have been any need to say so again in §107(b)? Section 107(b) only makes sense if §107(a) raised questions about how far Texas's authority reached *beyond* the limits of *Cabazon Band*. Section 107(b) simply but importantly clarifies that §107(a) adopts *only* Texas's substantive gaming laws and associated penalties. What §107(a) cannot be construed to do—according to §107(b)—is to authorize Texas to exercise the regulatory authority of administrative agencies or other enforcers of state law directly against the Tribe. Thus, Texas correctly explains that its Lottery Commission could not exercise "jurisdiction on the Tribe's reservation." Brief for Respondent 38. Likewise, its "local district attorneys" could not bring "criminal enforcement actions against the Pueblo in state court for violations of what has been adopted as federal law." *Id.*, at 38–39. Yet as §107(a) demands, the substance of the State's laws prohibiting certain gaming activities would remain enforceable in full.

The next section, §107(c), explains how: The State could enforce its laws by "bringing an action in the courts of the United States to enjoin violations of the provisions of this section." 101 Stat. 669.

*          *          *

The Ysleta del Sur Pueblo Tribe needed federal trust status to secure its future. Texas objected that granting this status might bring with it casino-style gaming. Categorically denying any interest in gaming, the Tribe requested that the pending bill conferring federal trust status be amended to prohibit on the reservation all gambling as defined by Texas law. The Tribe did so even though it acknowledged this would result in it being treated differently from other tribes. The proposal removed the State's objection and Congress passed the bill granting federal trust status to the Tribe, while—in §107(a)—specifically prohibiting on the reservation gaming activities barred under Texas law. At the same time, in §107(b), Congress protected the Tribe's interests by banning direct state enforcement on the reservation. Under §107(c), Texas would instead have to proceed in federal court. This was a careful balance struck by Congress.

The Court today throws out that balance, treating gaming on this reservation as if it were just like any other Public Law 280 reservation. I respectfully dissent.

Appendix to opinion of ROBERTS, C. J.

## APPENDIX



Motion for Summary Judgt., Exh. A, in No. 3:17–cv–179 (WD Tex., Nov. 11, 2018), ECF Doc. 146–1, p. 1.