**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-0527**

State of Minnesota,
Respondent,

vs.

Todd Jeremy Thompson,
Appellant.

**Filed February 2, 2026**
**Reversed**
**Connolly, Judge**
**Concurring specially, Wheelock, Judge**

Mahnomen County District Court
File No. 44-CR-24-293

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Jason M. Hastings, Mahnomen County Attorney, Mahnomen, Minnesota (for respondent)

Claire Nicole Glenn, Climate Defense Project, Minneapolis, Minnesota (for appellant)

Frank Bibeau, 1855 Treaty Authority, Grand Rapids, Minnesota (for amicus curiae 1855 Treaty Authority)

Considered and decided by Wheelock, Presiding Judge; Connolly, Judge; and Bond, Judge.

**SYLLABUS**

Minnesota Statutes section 152.0263, subdivision 1(1) (Supp. 2023), is a civil/regulatory statute, which the State of Minnesota lacks jurisdiction to enforce against an enrolled member of the White Earth Band of Ojibwe for the possession of cannabis flower occurring within the territorial boundaries of the White Earth Reservation.

## OPINION

**CONNOLLY**, Judge

Appellant challenges the denial of his motion to dismiss a charge of cannabis possession in the first degree, arguing that the statute criminalizing his possession of cannabis flower is civil/regulatory in nature under Public Law 280 and is therefore not enforceable against appellant as an enrolled member of the White Earth Band of Ojibwe. Appellant also argues that cannabis possession is a sovereign right reserved in the 1855 Treaty between the Ojibwe and the United States, which additionally bars his prosecution.

Because respondent State of Minnesota has adopted legislation decriminalizing the possession of cannabis flower by adults below certain quantities statewide and has authorized Tribal compacts for the regulation of cannabis by Minnesota's Tribal governments, we conclude that cannabis-flower possession is a civil/regulatory matter, which the state lacks jurisdiction to enforce against an enrolled member of the White Earth Band of Ojibwe for possession occurring on his own reservation. Consequently, we reverse the decision of the district court.

## FACTS

Appellant Todd Jeremy Thompson is an enrolled member of the White Earth Band of Ojibwe who owns and operates Asema Tobacco & Pipe Shop, LLC (the shop), on the White Earth Reservation in the City of Mahnomen. The shop is licensed as a tobacco distributor/wholesaler under the White Earth Reservation Tax Code but is not licensed to sell cannabis.

2

On August 2, 2023, law enforcement executed a search warrant at the shop and located 3,405 grams (or approximately 7.5 pounds) of cannabis flower. The state charged appellant in April 2024, with one count of cannabis possession in the first-degree, in violation of Minnesota Statutes section 152.0263, subdivision 1(1). Appellant moved to dismiss the complaint, arguing that the state lacks jurisdiction to prosecute him under the statute because, given the passage of the Minnesota Adult Use Cannabis Act, the statute was civil/regulatory in nature under Public Law 280. Additionally, appellant argued that the state lacks jurisdiction because cannabis possession is a sovereign right reserved in the 1855 Treaty between the Ojibwe and the United States.

The district court denied appellant's motion. The district court relied on two prior decisions by this court, *State v. St. Clair*, 560 N.W.2d 732, 734-35 (Minn. App. 1997), and *State v. LaRose*, 673 N.W.2d 157, 163-64 (Minn. App. 2003), *rev. granted* (Minn. Feb. 25, 2004) *and ord. granting rev. vacated* (Minn. Aug. 17, 2004), which each concluded that the possession of cannabis on reservation land was a criminal offense over which the state had enforcement jurisdiction under Public Law 280. The district court cited *LaRose* to support the proposition that Minnesota has a "heightened public policy" against the possession and use of illegal drugs, including cannabis, and that the possession of cannabis violates the state's "public criminal policy." *See* 673 N.W.2d at 164. As such, the district court determined that Minnesota Statutes section 152.0263 was criminal/prohibitory in nature, and that the state had enforcement jurisdiction under Public Law 280. The district court also rejected Thompson's treaty argument.

3

Appellant sought discretionary review of the district court's order by this court pursuant to Minnesota Rule of Criminal Procedure 28.02, subdivision 3. We granted discretionary review.

## ISSUES

I.    **Did the district court err in determining that the statute criminalizing appellant's cannabis-flower possession is a criminal/prohibitory law enforceable by the state under Public Law 280?**

II.   **Did appellant satisfy his burden to establish that cannabis possession is a right retained in the 1855 Treaty with the United States, which bars his prosecution as an enrolled member of the White Earth Band of Ojibwe?**

## ANALYSIS

Whether the state has jurisdiction to prosecute a tribal member charged with an offense committed within the territorial boundaries of their reservation is a question of federal law which we review de novo. *State v. Busse*, 644 N.W.2d 79, 82 (Minn. 2002). The interpretation of a treaty is also a question of law that we review de novo. *Richard v. United States*, 677 F.3d 1141, 1144-45 (Fed. Cir. 2012).

I.    **The district court erred in determining that the statute criminalizing appellant's cannabis-flower possession is a criminal/prohibitory law that the state is permitted to enforce under Public Law 280.**

The United States Supreme Court has "consistently recognized that Indian tribes retain attributes of sovereignty over both their members and their territory." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987) (quotation omitted). "This sovereignty is 'dependent on, and subordinate to, only the Federal Government, not the States.'" *State v. Stone*, 572 N.W.2d 725, 728 (Minn. 1997) (quoting *Cabazon*, 480 U.S.

4

at 207). "However, it is established that state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided." *Id.*

"In Public Law 280, Congress granted Minnesota broad criminal and limited civil jurisdiction over all Indian country within the state, with the exception of Red Lake Reservation." *Id.* (footnote omitted). Section 2 of Public Law 280 authorizes Minnesota to exercise jurisdiction over criminal matters, and section 4 authorizes Minnesota to exercise jurisdiction over civil causes of action between private parties. *See* 18 U.S.C. § 1162(a) (1994) (codifying Pub. L. No. 83-280, § 2); *see also* 28 U.S.C. § 1360 (1994) (codifying Pub. L. No. 83-280, § 4). Section 4, however, does not grant the state general civil/regulatory authority. *Stone*, 572 N.W.2d at 729.

> "Accordingly, when a State seeks to enforce a law within an Indian reservation under the authority of Pub. L. 280, it must be determined whether the law is criminal in nature, and thus fully applicable to the reservation under [section] 2, or civil in nature, and applicable only as it may be relevant to private civil litigation in state court."

*Cabazon*, 480 U.S. at 208.

To determine whether a state law is criminal or civil for purposes of determining its enforceability under Public Law 280, the Supreme Court in *Cabazon* adopted the following test:

> [I]f the intent of a state law is generally to prohibit certain conduct, it falls within Pub. L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub. L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the State's public policy.

5

*Id.* at 209. The Court noted, however, that the distinction between civil/regulatory and criminal/prohibitory is not a bright-line rule, and that "[t]he applicable state laws governing an activity must be examined in detail before they can be characterized as regulatory or prohibitory." *Id.* at 210, 211 n.10.

The Minnesota Supreme Court in *Stone* created a two-step approach for application of the *Cabazon* test. *Stone*, 572 N.W.2d at 730.

> The first step is to determine the focus of the *Cabazon* analysis. The broad conduct will be the focus of the test *unless* the narrow conduct presents substantially different or heightened public policy concerns. If this is the case, the narrow conduct must be analyzed apart from the broad conduct.

*Id.*

After identifying the conduct on which to focus the analysis, the second step is to apply the *Cabazon* standard to determine if the law is criminal/prohibitory or civil/regulatory. *Id.*

> If the conduct is generally permitted, subject to exceptions, then the law controlling the conduct is civil/regulatory. If the conduct is generally prohibited, the law is criminal/prohibitory. In making this distinction in close cases, we are aided by *Cabazon's* "shorthand public policy test," which provides that conduct is criminal if it violates the state's public policy.

*Id.* As "all laws implicate some public policy," the Minnesota Supreme Court interpreted "public policy," as used in *Cabazon*, to mean "public *criminal* policy." *Id.* "Public criminal policy goes beyond merely promoting the public welfare. It seeks to protect society from serious breaches in the social fabric which threaten grave harm to persons or property." *Id.*

**A.** **The proper focus of the *Cabazon* analysis is the broad conduct of cannabis-flower possession and not the narrow conduct of possessing an unlawful quantity of cannabis.**

As discussed, the first step of our analysis is to determine whether the broad or narrow conduct at issue is to be the focus of the *Cabazon* test. *Id.* Here, appellant is charged with possession of cannabis in the first degree, in violation of Minnesota Statutes section 152.0263, subdivision 1(1), which prohibits the unlawful possession of "more than two pounds but not more than ten kilograms of cannabis flower." Accordingly, the broad conduct that is addressed by this statute is the possession of cannabis flower, whereas the narrow conduct is the possession of cannabis flower in an amount greater than two pounds but less than ten kilograms. *See* Minn. Stat. § 152.0263, subd. 1(1). As *Stone* directs, the broad conduct is to be the focus of the *Cabazon* analysis unless "substantially different or heightened public policy concerns" are implicated by the narrow conduct. 572 N.W.2d at 730.

On August 1, 2023, legislation became effective in Minnesota that decriminalized the possession by adults of cannabis in certain forms and below certain quantities. 2023 Minn. Laws ch. 63, art. 1, § 9, at 2707-10 (codified at Minn. Stat. § 342.09 (2024)). Relevant here, the legislation specifically authorizes an adult 21 years of age or older to possess up to two pounds of cannabis flower in their private residence or up to two ounces of cannabis flower in a public place. Minn. Stat. § 342.09, subd. 1(2), (3). The possession of cannabis flower in quantities above these thresholds is criminalized by offenses of increasing severity depending on the amount by which they are exceeded. *See* Minn. Stat. §§ 152.0263, subds. 1-4 (criminalizing the possession of cannabis flower in quantities

7

greater than two ounces and not more than ten kilograms), .023, subd. 2(a)(5)(i) (2024) (criminalizing possession of more than ten kilograms of cannabis flower).

Our first question, therefore, is whether the possession of between two pounds and ten kilograms of cannabis flower—the behavior criminalized by the charged offense— implicates "substantially different or heightened public policy concerns" than those attendant to the lawful possession of up to two pounds of cannabis flower in one's own residence. *See Stone*, 572 N.W.2d at 730. We conclude that it does not.

Appellant argues Minnesota's 2023 cannabis legislation reflects the state's understanding that "possession of cannabis is neither an inherently dangerous activity nor one of particular public policy concern requiring categorical prohibition or criminalization." Indeed, if the possession of up to two pounds of cannabis flower by an adult in their own home is expressly permitted by statute, it is difficult to discern how merely possessing *more* than the authorized amount would constitute a "serious breach[] in the social fabric which threaten[s] grave harm to persons or property" such that our analysis should be restricted to the narrow, criminalized conduct rather than the broad conduct of possessing cannabis flower. *Stone*, 572 N.W.2d at 731. And the state does not present a compelling argument otherwise.

At oral argument, the state asserted that heightened public-policy concerns are implicated by the specific facts of appellant's case, which indicate that he was not possessing cannabis flower in his home or on his person but in the shop with the intention to sell it unlawfully. This argument is unpersuasive, however, because the possession of cannabis with the intent to sell it constitutes a distinct crime from the possession of

cannabis alone and is separately criminalized in statute. *See* Minn. Stat. §§ 152.0264 (defining cannabis sale crimes); .01, subd. 15(a) (defining "sell" for purposes of chapter 152 as including possession with the intent to sell) (2024). Of importance here is that appellant was not charged with a sale crime under section 152.0264, but rather with a possession offense under section 152.0263, subdivision 1. Had the state chosen to charge appellant with a sale crime on the theory that he intended to sell the cannabis flower he was found to be in possession of, then any policy distinctions between the possession and sale of cannabis would become relevant and perhaps compel a different result. But because the state charged appellant with only the possession of an unlawful amount of cannabis flower, the state's subjective belief as to the *purpose* of his possession in this instance does not alter the nature of the specific conduct criminalized by the charged statute, which is possession.

Because we cannot identify any "substantially different or heightened public policy concerns" that would arise solely on the basis of the quantity of cannabis flower possessed, we conclude that the proper focus of the *Cabazon* analysis is on the broad conduct of cannabis-flower possession and not on the narrow conduct of possessing an unlawful quantity of cannabis flower.

> **B.** **Because possession of cannabis flower is generally permitted in Minnesota, the statute is civil/regulatory and thus unenforceable against appellant.**

Having determined that the broad conduct of possessing cannabis flower is the proper focus of the *Cabazon* test, we turn to the question of whether the statute under which appellant is charged is criminal/prohibitory or civil/regulatory in nature. *See Cabazon*, 480

U.S. at 209-10; *see also Stone*, 572 N.W.2d at 730. In doing so, we must analyze whether the intent of the law is to generally permit the conduct subject to regulation, or if it is intended to generally prohibit the conduct. *See Stone*, 572 N.W.2d at 729.

Historically, the possession of cannabis or cannabis products was not permitted in any part of the state and, consequently, the laws proscribing such possession were deemed to be enforceable under Public Law 280's grant of criminal jurisdiction. *See LaRose*, 673 N.W.2d at 164 ("The possession of marijuana, like other illegal drugs in Minnesota, is criminal/prohibitory, not civil/regulatory."). As noted, however, the statutory framework on which this conclusion was based was significantly altered in 2023 by legislation which expressly authorized the possession of certain quantities and types of cannabis products by adults. *See* 2023 Minn. Laws ch. 63, art. 1, § 9, at 2707-10. And enforcement of the statute's quantity limitations (for amounts up to ten kilograms in the case of cannabis flower)[1] was separately provided for in concurrently enacted legislation that distinguishes cannabis-possession crimes from Minnesota's general controlled-substance-crime statutory scheme. *See* Minn. Stat. § 152.0263.

In addition, 2023 legislation acknowledged "the sovereign right of Minnesota Tribal governments to regulate the cannabis industry and address other matters of cannabis regulation related to the internal affairs of Minnesota Tribal governments or otherwise within their jurisdiction." 2023 Minn. Laws ch. 63, art. 6, § 2, at 2863 (codified at Minn.

---

[1] The possession of more than ten kilograms of cannabis flower remains criminalized by Minn. Stat. §§ 152.021-.023 (2024), which defines first-, second-, and third-degree controlled substance crimes.

Stat. § 3.9228, subd. 2(a) (2024)).  It was thus clearly also within the contemplation of the legislature that Minnesota's Tribes would retain their regulatory sovereignty concerning cannabis possession and sale.  Indeed, the White Earth Band subsequently adopted the White Earth Band of the Minnesota Chippwea Tribe's Adult-Use Cannabis Code, which created a regulatory framework for the possession and sale of cannabis on the White Earth Reservation.  Among the stated purposes of this code is to "[e]nsure that members of the White Earth Band, members of other federally recognized tribes, Minnesota residents, and other persons have the ability to lawfully obtain, purchase, receive, possess, and use Adult-use Cannabis" in accordance with its terms.  *See* White Earth Band of the Minnesota Chippewa Tribe Adult-Use Cannabis Code § 1.02(1)(c).

Accordingly, given the state's affirmative legalization of possession by adults of certain quantities and forms of cannabis, the state's authorization of tribal cannabis compacts to permit independent regulation of the cannabis industry on Tribal land, and the White Earth Band's implementation of its own cannabis-related code, we are satisfied that the intention of the legislature was to generally permit the possession of cannabis flower by adults, subject to regulation, and that *LaRose* and *St. Clair* have been superseded by statute as to the possession of those cannabis products specifically authorized by section 342.09, subdivision 1.  Moreover, because the possession of cannabis flower alone "clearly does not violate the public criminal policy of the state," this is not a close case and "there is no need to apply the shorthand public policy test." *Stone*, 572 N.W.2d at 731.

It bears noting as well that, although the possession of cannabis flower is regulated by means of criminal penalties, this is not dispositive to our analysis.  *See Cabazon*, 480

11

U.S. at 202-03 ("That an otherwise regulatory law is enforceable (as here) by criminal as well as civil means does not necessarily convert it into a criminal law within Pub. L. 280's meaning."). Here, notwithstanding the manner in which the conduct is regulated, we cannot ignore the clear language of the legislation that specifically permits the possession of cannabis flower by adults and that allows Minnesota's Tribes to implement their own regulatory structures concerning cannabis possession, and we are thus compelled to regard these criminal provisions as regulatory rather than punitive.

We therefore hold that, because Minnesota Statutes section 152.0263, subdivision 1(1), is civil/regulatory in nature, the State of Minnesota lacks jurisdiction under Public Law 280 to enforce it against a member of the White Earth Band for conduct occurring within the territorial boundaries of the White Earth Reservation. Our holding is consistent with the framing of the issue and decision by our supreme court in *Stone*, as well as the presentation of the issue by the parties. *See Stone*, 572 N.W.2d at 731 (holding that the laws involved in the case were civil/regulatory and therefore "the state lacks jurisdiction under Public Law 280 to enforce them against members of the White Earth Band of Chippewa for conduct occurring within the boundaries of their reservation").

## II. We decline to reach the issue of whether cannabis possession is a right protected by the 1855 Treaty between the Ojibwe and the United States.

Because we conclude that the state lacks jurisdiction to prosecute appellant for a violation of Minnesota Statutes section 152.0263, subdivision 1(1), pursuant to Public Law 280, we need not address the question of whether appellant's possession of cannabis flower is a right separately protected by treaty.

12

**DECISION**

The criminalization of the possession of cannabis flower under Minnesota Statutes section 152.0263, subdivision 1(1) is a civil/regulatory statute, which the state lacks jurisdiction to enforce against an enrolled member of the White Earth Band of Ojibwe for possession occurring on the White Earth Reservation. As such, the district court's order denying appellant's motion to dismiss the charge against him is reversed.

**Reversed.**

**WHEELOCK**, Judge (concurring)

Although I concur in much of the reasoning and the result reached by the majority, I write separately for two primary reasons. First, I query whether it is time for the supreme court to reconsider its decision in *State v. Stone*, 572 N.W.2d 725 (Minn. 1997). I would conclude that *Stone* creates an analytical framework that is in tension with the United States Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), as demonstrated by *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929 (2022). Second, I would not limit today's holding to White Earth tribal members and the White Earth Tribe's reservation. I would instead frame today's holding to apply to all of the federally recognized tribes within the State of Minnesota that are subject to Public Law 280.

I begin with a discussion of tribal sovereignty—a discussion that is necessary before a question of state jurisdiction over tribes can be resolved. I then provide an overview of the comprehensive legislation passed in 2023 that established new state policy on cannabis use, possession, and sale, and I identify where I differ from the majority in how to apply the *Cabazon* test to the state statute under which Thompson was charged. Finally, I address concerns with *Stone*'s articulation of the *Cabazon* test and with the appearance of a limitation in the majority opinion of today's holding to a specific tribe and reservation.

*Tribal Sovereignty and Public Law 280*

An understanding of the history of the relationship between tribes and the United States since contact and the formation of the United States is critical to fully consider questions of Indian law because that history has shaped federal policy and laws with respect

to tribes and has alternated between widely different views of tribes throughout that history. *See Cohen's Handbook of Federal Indian Law* § 1.04[3], at 5 (Nell Jessup Newton & Kevin K. Washburn, eds., 2024) [hereinafter *Cohen's Handbook*] (explaining that "[t]he history of federal Indian law is crucial to understanding the field" because, although "[t]he United States has always recognized tribal sovereignty," it "has pursued policies over time that appear to contradict one another," a "vacillation [that] has led to conflicting lines of precedent and to limitations on tribal sovereignty resulting from past intrusions" that include repudiated policies).[2]  Thus, any question of the jurisdiction of Indian tribes, the federal government, and the states must be resolved in light of that foundation.

Indian tribes are "separate sovereigns" that preexisted the United States Constitution.  *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978); *United States v. Wheeler*, 435 U.S. 313, 322-30 (1978) (stating that a tribe's power to prosecute its members for crimes derives from inherent sovereignty that is not delegated by the federal government).   Tribal sovereignty is neither dependent on nor subordinate to state governments.  *Stone*, 572 N.W.2d at 728 (citing *Cabazon*, 480 U.S. at 207).  Because Indian tribes "remain separate sovereigns," they "retain their historic sovereign authority" except when abrogated by Congress.  *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quotations omitted).  State governments may assert jurisdiction and enforce their laws over tribal members on their reservations *only* when and to the extent Congress has

---

[2] More than 570 tribes are federally recognized by the United States, *see* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 89 Fed. Reg. 99,899 (Dec. 11, 2024), each with a distinct history, language, and cultural, societal, and governmental practices.

so provided.  *Cabazon*, 480 U.S. at 207.  States do not have the authority to abrogate tribal sovereignty.  *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 168 (1973) ("[T]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." (quotation omitted)).

It is crucial that courts and legal practitioners understand that tribes have inherent sovereignty that existed before contact with European explorers—this includes rights, powers, and authority that have not been relinquished or abrogated—and that tribal rights are not rights given to the tribes by federal or state governments.  *See Cohen's Handbook*, *supra*, § 18.02[1][a], at 1125 (explaining that "tribal nations are 'distinct, independent political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial'" (quoting *Worcester v. Georgia*, 31 U.S. 515, 559 (1832)).  In the first chapter on foundational principles in the field of federal Indian law, *Cohen's Handbook* observes the following:

> Hundreds of Indian tribes governed the entire land mass of the of the present-day United States prior to its creation.  The United States asserted authority over these sovereign nations through a colonial process that was partly negotiated and partly imposed.  Federal Indian law mediates the resulting intergovernmental relations among the Indian nations, the United States, and the states of the Union.

*Cohen's Handbook*, *supra*, § 1.01, at 1 (footnote omitted).

Applying this lens, it becomes clear that, to understand the extent of the sovereign rights tribes retain and the extent to which Congress has authorized states to assert

jurisdiction over tribal members on their reservations, we must examine relevant acts of Congress and, at times, relevant treaties.[3]

In 1953, Congress passed Public Law 280, granting Minnesota and five other states broad criminal and limited civil jurisdiction over Indian country within each state. Pub. L. No. 83-280, 67 Stat. 588 (1953) (codified as amended at 18 U.S.C. § 1162 (2018)). Of the 11 federally recognized tribes located within Minnesota, nine are currently subject to Public Law 280.[4] Under section 2 of Public Law 280, Congress authorized Minnesota to

---

[3] We do not reach the merits of Thompson's arguments based on his reserved treaty rights under the Treaty of Washington, 1855; however, when considering legal issues involving treaties between the United States and Indian tribes, accuracy and an understanding of the specific historical context of the treaty at issue are again critical. Further, I note here that the state did not address Thompson's treaty-rights argument in its principal brief, and at oral argument, counsel for the state said, "If the court were to rule that he has a treaty right, . . . we would defer to the court with that." The district court did not find that Thompson had a reserved treaty right to possess cannabis—a plant medicine; however, in its discussion of Thompson's argument, it misstated the law when it said that any treaty rights belong only to the tribe as a whole. "It is well settled . . . that an individual Indian may assert usufructuary rights in a criminal prosecution." *United States v. Brown*, 777 F.3d 1025, 1032 (8th Cir. 2015); *see also United States v. Dion*, 476 U.S. 734, 738 n.4 (1986) (explaining that "treaty rights can be asserted by . . . an individual member of the Tribe"); *United States v. Winans*, 198 U.S. 371, 381 (1905) (explaining that "negotiations were with the tribe" but treaties "reserved rights . . . to every individual Indian, as though named therein"). Although treaty rights are held communally by a tribe, "[e]ach tribal member has the right to exercise the reserved rights, subject to tribal regulation, and *to sue to enforce those rights*." *Cohen's Handbook*, *supra*, § 20.03[1], at 1292 (emphasis added) (footnote omitted) (citing *Sohappy v. Smith*, 302 F. Supp. 899, 904 (D. Or. 1969)); *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 195-200 (1999) (holding that "[t]he entire 1855 Treaty, in fact, is devoid of any language expressly mentioning— much less abrogating—usufructuary rights"—it was merely a land-purchase treaty).

[4] There are 11 federally recognized Indian tribes within the state. *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 89 Fed. Reg. 99,899 (listing federally recognized tribes). However, Public Law 280 expressly excepted the Red Lake Reservation. 18 U.S.C. § 1162(a). And in 1973, Minnesota approved the retrocession of state criminal jurisdiction on the Bois Forte

exercise jurisdiction over certain criminal matters on Indian reservations.[5]  *See* 18 U.S.C. § 1162(a) (codifying Pub. L. No. 83-280, § 2).  And under section 4 of Public Law 280, Congress authorized Minnesota to exercise limited jurisdiction over civil causes of action between private parties arising on Indian reservations, but it did not grant the state general civil regulatory authority over tribal members on their reservations.  *Stone*, 572 N.W.2d at 729 (citing *Bryan v. Itasca County*, 426 U.S. 373, 384-88 (1976)); *see also* 28 U.S.C. § 1360 (2018) (codifying Pub. L. No. 83-280, § 4).

In 1987, the Supreme Court in *Cabazon* established a test for courts to apply to determine whether a state may enforce its laws in Indian country, distinguishing between

_____

Reservation.  *See* 1973 Minn. Laws ch. 625, § 3, at 1500, 1501 (retroceding state criminal jurisdiction over the Bois Forte Reservation to the federal government); *see also* Acceptance of Retrocession of Jurisdiction, 40 Fed. Reg. 4026 (Jan. 15, 1975) (accepting retrocession of state jurisdiction).

[5] Over 50 years later, Congress passed the Tribal Law and Order Act of 2010 (TLOA), which created a mechanism for tribal governments with reservations in Public Law 280 states to request either that the federal government have concurrent criminal jurisdiction with the state or resume federal criminal jurisdiction without the state also having criminal jurisdiction.  Pub. L. No. 111-211, § 221(a)(2), 124 Stat. 2261, 2271 (2010).  In Minnesota, the White Earth Band was granted concurrent jurisdiction, which took effect on June 1, 2013, Press Release, U.S. Dep't of Just., *United States to Accept Concurrent Jurisdiction Over White Earth Reservation in Minnesota* (Mar. 15, 2013), https://www.justice.gov/archives/opa/pr/united-states-accept-concurrent-jurisdiction-over-white-earth-reservation-minnesota [https://perma.cc/C4LJ-PPM8], and the Mille Lacs Band of Ojibwe was granted concurrent jurisdiction, which took effect on January 1, 2017, United States Assumption of Concurrent Federal Criminal Jurisdiction, 81 Fed. Reg. 4335, 4335-36 (Jan. 26, 2016).  When a state has concurrent jurisdiction with the federal government, the state's criminal jurisdiction is not altered.  Tribal members are still subject to state and tribal criminal laws.  The difference is that members of federally recognized tribes may be subject to federal prosecution for certain crimes *in addition to* any state or tribal prosecution that occurs.  *See* 25 U.S.C § 1321(a) (2018) (assumption by state of criminal jurisdiction); 28 C.F.R. § 50.25 (2024) (assumption of concurrent federal criminal jurisdiction).

laws that are "civil/regulatory" and laws that are "criminal/prohibitory."[6] *Cabazon*, 480 U.S. at 209. Laws that are civil/regulatory may not be enforced by states against tribal members on their reservations, while laws that are criminal/prohibitory may be enforced by states against tribal members on their reservations. *Id.* The Supreme Court further explained that the distinction between civil/regulatory and criminal/prohibitory is not subject to a bright-line rule and that "[t]he applicable state laws governing an activity must be examined in detail before they can be characterized as regulatory or prohibitory." *Id.* at 210, 211 n.10. It also stated, "The shorthand test is whether the conduct at issue violates the State's public policy." *Id.* at 209.

---

[6] The complex jurisdictional landscape that exists at the intersection of federal, tribal, and state law is often referred to as a jurisdictional maze because the determination of which sovereign or sovereigns have jurisdiction over an incident or set of circumstances is dependent upon the tribal status of the people involved (whether someone is a tribal member or can be identified as an "Indian"), the status of the land on which it occurred, and the nature of the issues that have arisen. *See State v. Roy*, 761 N.W.2d 883, 891 (Minn. App. 2009) ("[T]he regulation of nonmember Indians warrants different consideration than does regulation of member Indians . . . ." (quotation omitted)), *rev. denied* (Minn. May 19, 2009); *United States v. John*, 437 U.S. 634, 647-49 (1978) (looking first to the "situs of the alleged offense" and whether the site constituted Indian country to answer the question of jurisdiction). Thus, to properly navigate the jurisdictional maze, we must be precise in how we describe the facts of any case that involves tribes, tribal members, and tribal lands. Here, it is relevant that Thompson is an enrolled tribal member and that the incident occurred on the White Earth reservation, which is part of "Indian country." *See* 18 U.S.C. § 1151 (2018) (defining the term "Indian country"); *see also John*, 437 U.S. 634 at 648 (explaining that "Indian country" is defined broadly to encompass the three distinct categories of land in U.S.C. § 1151); *Cabazon*, 480 U.S at 207 n.5 (instructing that the term "Indian country" applies to questions of criminal and civil jurisdiction); *Negonsott v. Samuels*, 507 U.S. 99, 102 (1993) ("Criminal jurisdiction over offenses committed in Indian country, is governed by a complex patchwork of federal, state, and tribal law." (quotations omitted)).

Ten years later, in *Stone*, the Minnesota Supreme Court created a two-step approach for applying the *Cabazon* test. *Stone*, 572 N.W.2d at 730. In the first step, a court must determine whether the focus of the *Cabazon* test is "broad conduct" or "narrow conduct." *Id.* "The broad conduct will be the focus of the test *unless* the narrow conduct presents substantially different or heightened public policy concerns. If this is the case, the narrow conduct must be analyzed apart from the broad conduct." *Id.* In the second step, the court applies the *Cabazon* test to determine if the law is criminal/prohibitory or civil/regulatory. *Id.*

With this understanding of the legal landscape created by Public Law 280, *Cabazon*, and *Stone*, I turn to recent state legislation regarding cannabis in Minnesota.

*The 2023 Cannabis Law*

In 2023, Minnesota passed the Cannabis Finance and Policy Law (the 2023 cannabis law), establishing a new comprehensive state regulatory framework. 2023 Minn. Laws ch. 63, art. 1, at 2685-798 (codified as amended at Minn. Stat. §§ 342.01-.82 (2024)). The 2023 cannabis law legalized recreational adult use and possession of cannabis, including making it legal to possess up to two ounces of cannabis flower in public and up to two pounds at home. *See* Minn. Stat. § 342.09, subd. 1(a)(2)-(3). Private individuals may grow and gift their own cannabis. *Id.*, subds. 1(a)(6), 2. And commercial cannabis sales managed by the state and tribal governments are allowed, subject to the regulatory and licensing frameworks established in the 2023 cannabis law. *See, e.g.*, Minn. Stat. § 342.02 (establishing the office of cannabis management and tasking this office with the

development and implementation of operational and regulatory systems to oversee the cannabis industry).

The 2023 cannabis law explicitly addressed Indian tribes' sovereign authority in the provision that governs tribal-state cannabis compacts:

> The state of Minnesota acknowledges the sovereign right of Minnesota Tribal governments to regulate the cannabis industry and address other matters of cannabis regulation related to the internal affairs of Minnesota Tribal governments or otherwise within their jurisdiction, *without regard to whether such Tribal government has entered a compact authorized by this section*.

Minn. Stat. § 3.9228, subd. 2(a) (2024) (emphasis added). Tribes may voluntarily negotiate compacts with the state. *Id.*, subds. 2, 3 (2024). Thus, the legislature not only acknowledged tribal sovereignty, but took steps to encourage tribes to exercise their sovereign authority in the area of cannabis regulation.

The White Earth Band's decision to exercise its inherent sovereignty and adopt its code demonstrates that the state legislature's intentions are coming to fruition; however, the White Earth Band's decision whether to adopt cannabis laws is irrelevant to the determination of whether a state statute is civil/regulatory or criminal/prohibitory. As the state legislature recognized, tribes have the sovereign right to regulate cannabis, and this right is not abrogated merely because a tribe has not enacted a code. Pursuant to *Cabazon* and *Stone*,[7] it is the applicable state laws that must be examined in detail to determine

---

[7] In the *Stone* opinion's recitation of facts, the supreme court stated that, at the time of the offenses at issue in that case, White Earth did not have a "comprehensive" traffic code but that one was adopted shortly after the offenses occurred. 572 N.W.2d at 728. However,

whether Public Law 280 applies—not the tribe's law. *Cabazon*, 480 U.S. at 211 n.10 ("The applicable *state* laws governing an activity must be examined in detail before they can be categorized as regulatory or prohibitory." (emphasis added)). If anything, these provisions of the 2023 cannabis law may provide insight into the legislature's views of whether the state's cannabis laws are civil or criminal in nature. Thus, I disagree with the majority opinion's inclusion of the White Earth Band's implementation of its own cannabis-related code as relevant to our determination that the statute at issue is civil/regulatory.

*Civil/Regulatory Nature of the 2023 Cannabis Law*

Given this comprehensive and robust legislation and that the narrow conduct here—possession of cannabis—does not present substantially different or heightened public-policy concerns than the broad conduct of cannabis use, possession, and sale, and applying the *Cabazon* test to the state statute at issue in this case, I agree with the majority opinion that the statute is civil/regulatory.

I disagree, however, with any suggestion that a determination of whether the statute is civil/regulatory or criminal/prohibitory would be different if a different type of offense had been charged, such as possession with intent to sell. At oral argument, the state asserted that heightened public-policy concerns are implicated by specific facts of appellant's case that indicate he was possessing cannabis flower in his shop with the intention to sell it unlawfully. But counsel for the state also said he believed that, if Thompson had a license of some kind for the cannabis, the statute governing his conduct

that fact was not essential to the legal reasoning or decision in *Stone*; nor does it alter what may be considered when applying the United States Supreme Court's *Cabazon* test.

CS-9

would be civil/regulatory. Thus, even the state's characterization of Thompson's conduct is about compliance with a regulation—sale without a license as opposed to sale with a license—and there is no "serious breach[] in the social fabric which threaten[s] grave harm to persons or property" that would require analyzing a sale charge under the narrow-conduct prong of *Stone*. 572 N.W.2d at 730.

*Stone's Articulation of the* Cabazon *Test*

As an intermediate appellate court, we are tasked with correcting errors and bound by precedent. *Lake George Park, L.L.C. v. IBM Mid-Am. Emps. Fed. Credit Union*, 576 N.W.2d 463, 466 (Minn. App. 1998) ("This court, as an error correcting court, is without authority to change the law."), *rev. denied* (Minn. June 17, 1998). I write separately, in part, to question whether the supreme court should revisit *Stone* because it is in tension with *Cabazon*. I am concerned, particularly in light of intervening United States Supreme Court precedent, that the two-step process established in *Stone* does not align with the straightforward inquiry *Cabazon* requires and instead encourages an end run around the *Cabazon* test.

*Stone* and the two-part test it created are premised on the idea that the Supreme Court "did not clearly state whether 'the conduct at issue' to be analyzed is the broad conduct, such as gambling, or the narrow conduct, such as bingo." *Stone*, 572 N.W.2d at 729. But revisiting this premise may reveal that it is at odds with the Supreme Court's analysis of the conduct at issue in *Cabazon*.

The Supreme Court in *Cabazon* did not analyze only the narrow conduct at issue in that case—"high stakes, unregulated bingo"—which was prohibited under California penal

code; rather, it analyzed the conduct at issue from a broad perspective—in the language of its decision, *the activity* at issue—which, it determined, was gambling. 480 U.S. at 210-11 & n.10. *Cabazon*'s analysis of the conduct at issue was clear, both in how the Supreme Court articulated it and in how it applied the test. *Id.* at 211 n.10 ("[T]he applicable state laws governing *an activity* must be examined in detail before they can be characterized as regulatory or prohibitory." (emphasis added)). The Supreme Court reviewed the California Government Code, which allowed the state to operate a state lottery, and observed that California encouraged its citizens to participate. *Id.* at 210. It also reviewed the California Business and Professions Code, which permitted horse-race betting, and then it reviewed the penal code at issue, noting that certain games were prohibited and that games not enumerated were permissible. *Id.* After concluding that California *regulates* rather than *prohibits* gambling in general and bingo in particular, the Supreme Court appears to have rejected the narrow-conduct test that the Minnesota Supreme Court later adopted in *Stone*.

The Supreme Court explained that focusing on the criminal law at hand—which *Stone* characterized as the narrow conduct—was misguided because "the distinction between § 2 and § 4 of [Public Law 280] could easily be avoided and total assimilation permitted."[8] *Id.* at 211. Based on this reasoning, the Supreme Court rejected California's

---

[8] In elucidating the civil/regulatory-versus-criminal/prohibitory test, the Supreme Court recalled its decision in *Bryan*, 426 U.S. 373, in which it recognized a dichotomy between regulatory and prohibitory laws and rejected the notion that Public Law 280 granted states general civil regulatory power over Indian reservations. *Cabazon*, 480 U.S. at 208. Immediately before setting forth the holding in *Cabazon*, the Court described the careful balance it struck when recognizing that distinction, specifically explaining that "Congress's primary concern in enacting Pub. L. 280 was combating lawlessness on reservations," that Public Law 280 "plainly was not intended to effect total assimilation of

position that it should look at the narrow conduct of "high stakes, unregulated bingo" rather than reviewing state laws governing gambling as a whole. *Id.*

Recently, the Supreme Court addressed the distinction between regulatory and prohibitory laws in *Ysleta Del Sur Pueblo*, 142 S. Ct. 1929. In that case, the Ysleta del Sur Pueblo, a federally recognized tribe with a reservation in Texas, engaged in gaming activity—specifically, bingo—that violated state law but not federal law, and the state filed a lawsuit seeking to enjoin the tribe from continuing its bingo operations. *Ysleta*, 142 S. Ct. at 1934-37. The parties disagreed about the interpretation of a federal law,[9] passed just six months after the Supreme Court issued its decision in *Cabazon*, that also used a regulatory-prohibitory distinction to prescribe the extent to which tribal gaming is allowed on the Ysleta del Sur Pueblo's reservation and its other lands. *Ysleta*, 142 S. Ct. at 1935-37. The federal law, in part, expressly provided that "[a]ll gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe" and also stated that "[n]othing in this section shall be construed as a grant of civil or criminal regulatory jurisdiction to the State of Texas." *Id.* at 1938. The Supreme Court observed that "the most striking feature" about the statutory language "is its dichotomy between prohibition and regulation" because "[t]he implication that

---

Indian tribes into mainstream American society," and that "a grant to States of general civil regulatory power over Indian reservations would result in the destruction of tribal institutions and values." *Id.* In my view, a proper application of the *Cabazon* test therefore acknowledges the balance the Supreme Court intentionally struck.

[9] Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act, Pub. L. No. 100-89, 101 Stat. 666 (1987).

Congress drew from *Cabazon* and meant for us to apply its same prohibitory/regulatory framework here seems almost impossible to ignore." *Id.*

The Supreme Court then interpreted the terms "regulate" and "prohibit" and concluded that the provision barring gambling that was "prohibited" by the state covered only those forms of gambling that were outright banned by the state. *Id.* The Supreme Court reasoned that to "*prohibit* something means to 'forbid,' 'prevent,' or 'effectively stop' it, or 'make [it] impossible,'" in contrast with "to *regulate*," which "is usually understood to mean to 'fix the time, amount, degree, or rate' of an activity 'according to rule[s],'" and that, as such, the two words frequently are ''not synonymous." *Id.* (first quoting *Webster's Third New International Dictionary* 1813, 1913 (1986); and then quoting *Black's Law Dictionary* 1212 (6th ed. 1990)). In doing so, the Court focused its analysis on the broad conduct or activity that was the subject of the state statute. The Texas laws at issue in *Ysleta* permitted some forms of bingo, subject to regulation, yet the State of Texas argued they were prohibitory because deviations from the restrictions on time, place, and manner were criminal violations. *Id.*[10]

---

[10] The Court bolstered its statutory-interpretation analysis by addressing canons of interpretation and "contextual clues":

> Even if fair questions remain after a look at the ordinary meaning of the statutory terms before us, important contextual clues resolve them. Recall that Congress passed the Act just six months after this Court handed down *Cabazon*. In that decision, the Court interpreted Public Law 280 to mean that only ''prohibitory'' state gaming laws could be applied on the Indian lands in question, not state ''regulatory'' gaming laws. The Court then proceeded to hold that California bingo laws— laws materially identical to the Texas bingo laws before us

The Supreme Court rejected the state's position, highlighting its reasoning in *Cabazon* that "'an otherwise regulatory law' is not enforceable under Public Law 280 merely because a State labels it 'criminal.'" *Id.* at 1935 (quoting *Cabazon*, 480 U.S. at 211). The Supreme Court concluded that the Texas statutes were civil/regulatory and the state could not enforce them against the Tribe on its land. *Id.* at 1938.

Our supreme court did not have the benefit of the Supreme Court's decision in *Ysleta* when it decided *Stone* and has not had occasion to revisit *Stone* since *Ysleta* was decided. And the intervening precedent of *Ysleta* is instructive as to the continued viability of

---

today—fell on the regulatory side of the ledger. Just like Texas today, California heavily regulated bingo, allowing it only in certain circumstances (usually for charity). Just like Texas, California criminalized violations of its rules. Still, because California permitted some forms of bingo, the Court concluded that meant California did not prohibit, but only regulated, the game.

For us, that clinches the case. This Court generally assumes that, when Congress enacts statutes, it is aware of this Court's relevant precedents. And at the time Congress adopted the Restoration Act, *Cabazon* was not only *a* relevant precedent concerning Indian gaming; it was *the* precedent. *In* Cabazon, *the Court drew a sharp line between the terms prohibitory and regulatory* and held that state bingo laws very much like the ones now before us qualified as regulatory rather than prohibitory in nature. We do not see how we might fairly read the terms of the Restoration Act except in the same light. After all, "[w]hen the words of the Court are used in a later statute governing the same subject matter, it is respectful of Congress and of the Court's own processes to give the words the same meaning in the absence of specific direction to the contrary."

*Id.* at 1940 (emphasis added) (citations omitted) (quoting *Williams v. Taylor*, 529 U.S. 420, 434 (2000)).

CS-14

*Stone*'s analysis of Cabazon. Logically, if the distinction between state criminal/prohibitory laws and state civil/regulatory laws could be properly ascertained merely by looking at the narrow conduct or the fact that the specific statute being analyzed is criminal, penal, or prohibitory, there would be no need for the *Cabazon* test. *Ysleta* explains that circular reasoning results when the narrow conduct addressed by the statute is the focus of the analysis:

> No one questions that Texas 'regulates' bingo by fixing the time, place, and manner in which the game may be conducted. The State submits only that, in some sense, its laws *also* 'prohibit' bingo—when the game fails to comply with the State's time, place, and manner regulations. But on that reading, the law's dichotomy between prohibition and regulation collapses. Laws regulating gaming activities *become* laws prohibiting gaming activities.

*Id.* at 1939. Because the narrow conduct that is the subject of a state statute is prohibited and thus presumably is against the public policy of the state, it is difficult to imagine a scenario in which review of the narrow conduct will result in a conclusion that the state statute is not criminal/prohibitory in nature. I believe that this is precisely the result the Supreme Court was trying to avoid.

For these reasons, the narrow-conduct analysis articulated in *Stone* appears to be in tension with the analysis that *Cabazon* requires. Given the clarity provided in *Ysleta*, it is appropriate for our supreme court to revisit its decision in *Stone*.

Finally, I end where I began—convinced that today's holding is not limited to the White Earth Band and the White Earth Reservation. Based on an analysis under *Cabazon*, the state statute prohibiting possession of cannabis over a specific amount is

civil/regulatory in nature, and this distinction does not change depending on the tribe involved. Indeed, we granted discretionary review because "a decision on the jurisdiction of the state to enforce Minnesota's cannabis-possession laws and on the extent of the rights reserved under applicable treaties will have an immediate statewide impact on all Tribes in Minnesota subject to Public Law 280 and on their members." Because it would otherwise be illogical and antithetical to judicial economy and our duty to deliver justice, I would frame today's holding more broadly. Such framing avoids forcing other tribes or their members in Minnesota to relitigate this exact issue. It is not just possible, but likely, that another member of a different tribe on a different reservation will be arrested, notwithstanding that possession of cannabis is regulatory in nature and falls within the Tribes' regulatory authority. Our decision today applies in equal measure to all Indian tribes in Minnesota that are subject to Public Law 280.